**HORIZON FINANCIAL, F.A., Plaintiff,**

v.

**E. Lewis HANSEN and Hurt, Richardson, Garner, Todd and Cadenhead, Defendants.**

**Civ. A. No. 1:88–CV–2471–JOF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 11, 1992.

Spencer J. Krupp, Spix, Krupp & Reece, Atlanta, Ga., David L. Braverman, Robert C. Seiger, Gary P. Lightman, Roger A. Brush, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, Pa., for plaintiff.

Homer Lamar Mixson, Cathleen Mary Mahoney, Bondurant, Mixson & Elmore, Atlanta, Ga., for defendants.

## ORDER

FORRESTER, District Judge.

This matter is before the court on defendant E. Lewis Hansen and defendant Hurt, Richardson, Garner, Todd and Cadenhead's motion for summary judgment and motion for leave to file an affidavit in support of their reply brief. This order follows oral argument and supplemental briefing. The court orally granted in part and denied in part the motion for leave a to file supplemental affidavit, stating that it would consider the affidavit of defendant Hansen only for the purposes of authenticating documents.

Plaintiff Horizon Financial, F.A. (Horizon), is a federally chartered savings and loan association with its principal place of business in Pennsylvania. Horizon is now managed by the Federal Deposit Insurance Corporation on behalf of the Resolution Trust Corporation, the receiver for Horizon Financial. Hurt, Richardson, Garner, Todd and Cadenhead (HRGT & C) is a Georgia general partnership engaged in the practice of law. Defendant E. Lewis Hansen is a HRGT & C partner who was the senior attorney rendering legal services to Brokers South, Inc. (Brokers), and other previously dismissed defendants. Brokers is a Georgia corporation with its principal place of business in Atlanta, Georgia.

## I. FACTS

Defendants Hansen and HRGT & C represented Brokers in a series of three loan transactions with Horizon through which Horizon loaned Brokers approximately $23 million. Some of the proceeds of each loan were used by Brokers to purchase three portfolios of accounts receivable from Horizon. The parties executed a series of security agreements, promissory notes and related documents with each transaction. The notes were guaranteed by James Gresham, the President of Brokers, and various related corporations. As a prerequisite to closing each loan agreement, HRGT & C provided Horizon with an opinion letter concerning the transaction.

The three agreements provide that the agreements and the other loan documents,

unless specifically stated to the contrary in such document, "shall be governed by and interpreted in accordance with the laws of the state of Georgia." Each agreement also provides,

> All representations, warranties, covenants and agreements contained herein or in any of the other Loan Documents, or otherwise made in writing by the Company to the Bank shall survive the execution and delivery of this Agreement and the other Loan Documents and the making of the advances.

The term "Loan Documents" refers to the Agreement, the Notes, the Security Agreement, the Deeds to Secure Debt, and said. guarantor's Security Agreements, and all other documents and agreements evidencing or relating to any and all of the Obligations or evidencing any and all security or collateral arrangement with respect to any or all of the Obligations are collectively hereinafter referred to as the "Loan Documents."

The first agreement, dated October 31, 1985, set forth the terms of a first and a second mortgage term loan and established the terms of a revolving loan. The second agreement was titled "Loan Agreement dated October 31, 1985 as amended and restated on December 6, 1985." It incorporated the terms of the first promissory note, increased the amount available under the revolving loan, and provided for an additional term loan. The third agreement was titled "Amended and Restated Loan Agreement as of July 3, 1986." It also incorporated the terms of the prior promissory notes and provided for additional loans.

Sometime after the third loan agreement was closed, several disputes arose between the parties. Plaintiff claimed that Brokers was unable to meet its obligations under the agreement. Defendants claimed that plaintiff had misrepresented the quality and payment history of the loan portfolios that Brokers purchased from Horizon. To resolve the dispute, Brokers and Horizon negotiated a "Restated Term Loan Agreement" (Restated Agreement) which consolidated the loans made under the previous agreements into three new "Credit Facilities" identified as the Real Estate Loan, the Portfolio Loan, and the Brokers Term Loan. Horizon agreed to repurchase a loan portfolio from Brokers and credited Brokers with payment of $4.8 million, leaving an outstanding balance of approximately $19 million.[1] Sandra Chitwood was substituted for James Gresham as guarantor of the debt. The parties also executed a "Mutual Release Agreement" on September 4, 1987. Neither Hansen nor anyone from HRGT & C was a signatory to the Mutual Release Agreement. As a prerequisite to the Restated Term Loan Agreement, HRGT & C again issued an opinion letter concerning the loan transaction.

Each of the first three opinion letters stated that they were furnished as a prerequisite under the loan agreement. As noted above, they also state that they are "rendered solely for the benefit of the addressee hereof in connection with the loans." HRGT & C states that it has,

> relied upon the representations made by Borrower and Guarantors and the Loan Documents and ... have made no independent investigation to verify the accuracy of such representations; however, in the course of our representation of Borrower and Guarantors as hereinabove described, nothing has come to our attention which would prevent our reliance thereon.

The three letters also represent that, "[n]othing has come to our attention in the course of our representation of Borrower or Guarantors as herein above described which would lead us to believe that the Borrower or any of the Guarantors has committed any fraud against the bank."

The opinion letter issued with the 1987 Restated Agreement again recited that

---

**1.** The restated agreement gave Horizon substantial control over disposition and encumbrance of all the assets of Brokers and its affiliated companies, over the compensation paid employees, over the payment of dividends, issuance or redemption of stock, acquisitions or mergers, formation of new corporations, and over the incurring of any debt and the entry of sale/leaseback agreements.

HRGT & C had relied on representations made by Brokers and the guarantors and that in the course of HRGT & C's representation, "nothing has come to our attention which would prevent our reliance thereon." HRGT & C also represented that "[w]e have questioned Borrower and Guarantor about the accuracy and validity of such representations." One difference from the previous letters is the omission of the paragraph representing that nothing had come to HRGT & C's attention that would lead HRGT & C to believe that its clients had committed any fraud against plaintiff.

Gene Artrip and Sandra Chitwood, both former clients of defendants, participated in the negotiations leading up to the Restated Agreement. Sandra Chitwood was the sole shareholder of Brokers and served as its Secretary and Treasurer. Gene Artrip worked as a consultant for Brokers, and he and his wife, Margaret, are allegedly the sole shareholders, officers and directors of Southeast Auto Finance, Inc., an affiliated corporation. Robert Hatfield is the president of Brokers and allegedly received 100 shares of a new class of Brokers stock. James Gresham was formerly Brokers' president. He is also Margaret Artrip's brother.

Artrip has testified that he kept Hansen "informed of everything at Brokers South from the little things all the way to the big things—[such] as transactions with Horizon Financial...." Chitwood also conducted negotiations with Allen Hammer, an officer of Horizon, concerning the restructuring and release. Chitwood testified that there was no discussion about releasing the attorneys. When asked what her intention was, she stated, "the attorneys were not included in the release. There was no reason to include the attorneys in the release."

Chitwood testified that she, Hansen, and David Eldridge, another lawyer then associated with HRGT & C, "discussed at length the release and went over it very carefully." Chitwood further testified that she met with Hansen to go over the specifics of the final draft.

> Mr. Hansen explained to me that the release covered all the employees of Bro-

kers South and, Gene [Artrip], as a consultant of Brokers South. His concern and the reasons he added Jim Clark's name was that Jim Clark was neither consultant or an employee; therefore, he might possibly not be included, and that's why his name was added individually and Mr. Gresham's was there individually.

Chitwood also testified that Hansen never indicated to her that he felt he or his law firm was included within the ambit of the release. She stated that she did not intend to release Horizon's attorney and that it was her understanding that Hansen was not released by Horizon under the document. Hammer testified that he believed Horizon released the Brokers, its principals, and one or two other individuals, but not Hansen or HRGT & C. Hansen himself has testified that he did not release Horizon in connection with the transaction and that he was not aware of any release given Horizon by HRGT & C.

The record contains an affidavit by Artrip in which he states that at the preliminary meetings held to prepare the documents for closing the Restated Agreement, David Eldridge,

> specifically demanded a release of the HRGT & C law firm, including a release of the earlier opinion letters, delivered by HRGT & C law firm to Horizon Financial and the prior loan closings for Brokers South. The attorney for Horizon specifically refused to allow any release of the Hurt Richardson law firm from any obligation. The undersigned specifically remembers David Eldridge becoming visibly, almost violently, upset which the undersigned reported to E. Lewis Hansen and Sandra Chitwood.

Artrip states that he remembers Hansen coming to the closing to discuss the matter of the release with Eldridge and Horizon's attorney. He also states that he "specifically remembers E. Lewis Hansen directing that the loan be closed without any release being given by any party to attorneys representing the various parties in the closing." Chitwood testified that she informed Hansen of the dispute concerning the opinion letters and asked him to go to the

closing to help resolve the problem. Hansen admitted that he came to the closing at Chitwood's request.

Plaintiff alleges that, after Brokers defaulted under the Restated Agreement, plaintiff undertook an extensive investigation of Brokers' finances and transactions to determine why Brokers could not meet its obligations. Plaintiff claims that this year-long investigation revealed "a pervasive, on-going fraud of massive proportions in which Brokers, some of its principals and affiliated companies and the Hansen defendants actively participated."

Each loan agreement had restricted the use of the proceeds of each credit facility. Each agreement also prohibited Brokers from: making contracts with affiliated corporations; entering transactions with Brokers' shareholders, directors, officers, or employees without obtaining prior approval from Horizon; and transferring real property and then leasing the same property. Sandra Chitwood testified that, despite these restrictions, Hansen assured her that she was free to use the loan proceeds as she wished. Chitwood has also testified that Hansen facilitated and personally participated in a number of transactions which plaintiff contends violated the restrictions in the loan agreements.

The day after closing of the first loan agreement, Brokers made an unsecured loan to Chitwood, Brokers' sole shareholder and director at the time. Chitwood gave the proceeds to Hansen who then purchased a piece of property in his own name to avoid granting a security interest in the property to Horizon. Hansen transferred title to the property to GAG Enterprises, Inc. (GAG), which leased the property back to Brokers for use as an automobile sales lot. Hansen himself incorporated GAG and served as its sole shareholder and officer. Hansen told Chitwood that she did not have to inform Horizon that she had borrowed the money from Brokers or that she had purchased the property.

In November of 1985, Hansen again used proceeds of the Horizon loan to purchase a piece of property in his own name. After issuing a deed to secure debt to Chitwood, he sold the property to GAG. GAG then sold the property to Southeast Auto Finance, Inc. (Southeast), a corporation whose relationship to Brokers was not disclosed. Plaintiff alleges that Hansen received an "under-the-table" payment in connection with the transaction. Defendants deny any wrongdoing.

After a series of transfers handled by Hansen, Chitwood received title to a junkyard property in June of 1985. Although the property was used by Brokers for business purposes, Horizon was not given a security interest in the property under the October 31, 1985 loan agreement. In February of 1986, title to the junkyard property was transferred to GAG so that Brokers avoided granting Horizon a security interest under the July 3, 1986 loan and the 1987 Restated Agreement. After settling with Horizon in this lawsuit, plaintiff alleges that Brokers attempted to transfer title to the property to Horizon but could not do so because Hansen refused to allow GAG to release the property to Brokers or Horizon.

Plaintiff has also produced evidence that Hansen and another HRGT & C attorney facilitated and participated in a number of similar transactions. In each instance, proceeds from Horizon were used by GAG or Southeast to purchase property that was used and controlled by Brokers. Options to purchase the properties were transferred to GAG from Brokers or Gresham, or were exercised by Southeast. Payments on deeds to secure debt were made by Brokers with Horizon loan proceeds. Title remained in GAG or was transferred to Southeast to avoid granting a security interest to Horizon. Hansen and other HRGT & C attorneys drafted the documents for these transactions.

Brokers and Hansen did not reveal the relationship between GAG and Brokers prior to the 1987 Restated Agreement. Plaintiff argues that, because GAG was merely a conduit for Brokers and was funded entirely by Brokers, it was an affiliated corporation that should have been identified as a guarantor. In June of 1986, Tony Flor, a Horizon employee, did discover that four

properties being leased by Brokers from GAG had been purchased with proceeds from the Horizon loans. After consulting with Hansen, Chitwood granted Horizon a security interest in those properties but did not disclose the similar lease-back arrangements on other properties titled in GAG.

Plaintiff has produced evidence that Hansen and HRGT & C advised Brokers and the other settling defendants in a number of transactions that constituted violations of the loan agreements. Hansen and HRGT & C drafted the documents for each of these transactions but failed to disclose them to Horizon. These transactions include alleged "laundering" and diversion of loan proceeds by Hansen and HRGT & C, unauthorized loans by Brokers, distribution of Brokers' assets to undisclosed affiliates incorporated by Hansen, and the unauthorized issuance of stock. Defendants dispute many of plaintiff's allegations.

On October 28, 1988, plaintiff filed suit against Brokers, James Gresham, Sandra Chitwood, Gene Artrip, Margaret Artrip, Robert Hatfield, various corporations affiliated with Brokers, E. Lewis Hansen, and HRGT & C. After settling with plaintiff, all defendants except Hansen and HRGT & C were voluntarily dismissed. Plaintiff recovered property having a value of approximately $3,080,000 from the settling defendants. Plaintiff was granted leave to file an amended complaint stating only its claims against Hansen and HRGT & C.

## II. MOTION FOR SUMMARY JUDGMENT

Count one of the amended complaint is brought under 18 U.S.C. § 1961, *et seq.* (RICO). It alleges that Hansen and HRGT & C, together with one or more of the settling defendants, constitute an "enterprise" that engaged in a willful and intentional scheme to defraud plaintiff. Hansen and HRGT & C are accused of participating in the scheme by managing the enterprise, by repeatedly making false and fraudulent misrepresentations to plaintiff, and by repeatedly misappropriating funds made available for the use or benefit of Brokers. During oral argument, the court observed that plaintiff's definition of the "enterprise" was insufficient and that it would direct plaintiff to amend count one of the complaint.

Counts two, three and four, respectively, assert conversion, fraudulent misrepresentation and negligent misrepresentation claims against HRGT & C and Hansen. Count five asserts a breach of warranty claim against HRGT & C based on the content of the opinion letters. Hansen and HRGT & C counterclaimed, asserting that plaintiff's claims lacked substantial justification in law or fact and were imposed only to force the settling defendants to obtain new counsel and to pressure them into a quick and favorable settlement. HRGT & C claims that the loss of Brokers and the other defendants as clients has cost the firm over $250,000 in legal fees. HRGT & C seeks compensatory damages in that amount but alleges no legal theories which would support its claim.

Hansen and HRGT & C move for summary judgment[2] on grounds that the Mutual Release bars all recovery by plaintiff from these defendants. Defendants also argue that only the 1987 opinion letter is actionable, and that plaintiff's allegations under it, at most, concern non-disclosures which are not actionable because HRGT & C had no duty to disclose the affairs of its clients to a non-client.

---

**2.** Fed.R.Civ.P. 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to the party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Brown v. City of Clewiston,* 848 F.2d 1534, 1536 (11th Cir.1988). Once the movant carries his burden of asserting the basis for his motion, *see Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552, the non-moving party is then required "to go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id.,* at 324, 106 S.Ct. at 2553. To survive a motion for summary judgment, the non-moving party must come forward with specific evidence of every element material to his case so as to create a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552; *Brown,* 848 F.2d at 1537.

## A. Applicable Law

■ When considering a choice of law question, a federal court hearing a diversity case is bound by the forum state's conflict of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *General Tel. Co. of the Southeast v. Trimm*, 706 F.2d 1117 (11th Cir.1983); *Broyles v. Bayless*, 878 F.2d 1400 (11th Cir.1989). In contract cases involving conflict of laws issues, the rule of *lex loci contractus* controls in Georgia. *General Tel. Co. of Southeast v. Trimm*, 252 Ga. 95, 311 S.E.2d 460 (1984). Releases are contracts and are, therefore, governed by the law of the place where they are executed. *Menendez v. Perishable Distributors, Inc.*, 254 Ga. 300, 301, 329 S.E.2d 149 (1985); *Southern Bell Tel. & Tel. Co. v. Smith*, 129 Ga. 558, 59 S.E. 215 (1907). The Restated Agreement and the accompanying release were signed in Pennsylvania. Under the *lex loci contractus* rule, the documents are governed by Pennsylvania law.

■ The release states that the Restated Agreement is governed by Pennsylvania law. The parties to a contract may choose another state's law as the applicable law as long as the transaction bears an appropriate or reasonable relation to the state so designated. *United Counties Trust Co. v. Mac Lum, Inc.*, 643 F.2d 1140 (5th Cir. 1981).[3] An appropriate and reasonable relationship to the State of Pennsylvania clearly exists. The record indicates that some of the negotiations took place in Pennsylvania. All of plaintiff's offices are located in Pennsylvania. Thus, Pennsylvania law would control even if Pennsylvania was not the place of execution.

■ Defendants argue that Georgia law should nonetheless control, citing *Ryder*

*Truck Lines, Inc. v. Goren Equipment Co.*, 576 F.Supp. 1348 (N.D.Ga.1983), where this court held that a choice of law provision could be ignored where issues of fraud and duress going to the validity of the underlying contract were raised.[4] However, the validity of the Mutual Release has never been at issue in this lawsuit. Plaintiff has never alleged that the release was fraudulently or coercively procured. Instead, the defense raised by Hansen and HRGT & C goes to the construction and interpretation of the release, not its validity. The court finds that the scope of the release is governed by Pennsylvania law.

## B. Release of a Joint Tort-feasor

Defendants maintain that the Mutual Release executed with the 1987 Restated Term Loan releases E. Lewis Hansen and HRGT & C from liability to plaintiff as to any cause of action arising before September 4, 1987 because, under both Pennsylvania and Georgia law, release of one joint tort-feasor releases all others. Defendants badly misinterpret the law of both jurisdictions.

■ Because the release is governed by Pennsylvania law, its effect is also determined by Pennsylvania law. *See Menendez v. Perishable Distributors, Inc.*, 254 Ga. at 301, 329 S.E.2d 149 (under Georgia's *lex loci contractus* rule, the effect of a release is governed by the law of the state where the release was executed). Under Pennsylvania law, actors are joint tort-feasors when their conduct "causes a single harm which cannot be apportioned ... even though [the actors] may have acted independently." *Rabatin v. Columbus Lines, Inc.*, 790 F.2d 22, 25 (3d Cir.1986), quoting *Capone v. Donovan*, 332 Pa.Super. 185, 480 A.2d 1249, 1251 (1984) and Restate-

---

**3.** Under Georgia's version of the Uniform Commercial Code, parties to a contract may stipulate that the law of another jurisdiction will govern the transaction. O.C.G.A. § 11–1–105(1); *Crompton–Richmond Co., Inc., Factors v. Briggs*, 560 F.2d 1195 (5th Cir.1977) (statute allows contracting parties to make their own choice of applicable state law).

**4.** Under Georgia law, a choice of law provision will not be honored if the provision's effect is contrary to a fundamental public policy of the state, and the chosen forum state has no greater interest in the litigation than the State of Georgia. *Nordson Corp. v. Plasschaert*, 674 F.2d 1371, 1374–75 (11th Cir.1982).

ment (2d) of Torts § 879 (1977).[5] "A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tortfeasor unless the release so provides, but reduces the claim against the other tortfeasor in the amount of consideration paid for the release...." 42 Pa.C.S.A. § 8326. Under this statute, it is clear that the release of the settling defendants was ineffective to release Hansen and HRGT & C insofar as they are alleged to be joint tortfeasors with the settling defendants. *Capone v. Donovan,* 332 Pa.Super. 185, 480 A.2d at 1252.

Defendants' argument that plaintiff is entitled to only one satisfaction is also completely off the mark. A jury must first determine the amount of plaintiff's losses before the court can determine if the settlement with the other defendants was adequate redress. *Capone v. Donovan,* 480 A.2d at 1252. Further, defendants have not contested the amount owing under the Restated Term Loan Agreement. The undisputed facts indicate that plaintiff has yet to recover at least $15 million.

### C. *The 1987 Release*

Defendants argue that the word "agents" as used in the definition of the term "BORROWER RELEASED PARTIES" applies to them. Plaintiff contends that the face of the document and the uncontradicted evidence show that the parties to the release did not intend to include Horizon's and Brokers' attorneys.

### 1. Scope of the Release

 Under Pennsylvania law, releases are generally interpreted by the rules of contract construction. *Sparler v. Fireman's Ins. Co.,* 360 Pa.Super. 597, 521 A.2d 433 (1987). Thus, the intention of the parties to a release is paramount and is gleaned primarily from the language used. *Id.* 521 A.2d at 433; *Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885, 892 (3d Cir.1975); *Evans v. Marks,* 421 Pa. 146,

218 A.2d 802 (1966). The scope of a release is determined by the language appearing therein, which must be interpreted according to its ordinary meaning unless it appears that the parties intended to convey a different meaning. *Brosius v. Lewisburg Craft Fair,* 383 Pa.Super. 454, 557 A.2d 27, 28 (1989). The natural meaning of the words employed controls. *Dickun v. United States,* 490 F.Supp. 136 (W.D.Pa.1980).

#### a. *Language of the Document*

 The court begins its inquiry by looking at the face of the document. The release states,

"LENDER and BORROWER have agreed to modify the PRIOR LOANS.... [T]he parties wish to terminate and resolve any claims which either BORROWER ENTITIES or LENDER could assert against the other arising out of the administration of the PRIOR LOANS and [portfolios]."

The BORROWER RELEASING PARTIES release the LENDER RELEASED PARTIES and the LENDER RELEASING PARTIES release the BORROWER RELEASED PARTIES.

The release defines BORROWER as Brokers. BORROWER ENTITIES includes Brokers, James Gresham, Sandra Chitwood, James Clark, and a list of affiliated corporations. BORROWER RELEASING PARTIES include "BORROWER ENTITIES, their officers, directors, shareholders, employees, agents, successors and assigns and their respective agents, representatives, executors, heirs, successors and assigns." BORROWER RELEASED PARTIES include BORROWER ENTITIES and "their officers, directors, shareholders, employees, agents, successors and assigns and their respective agents, representatives, executors, heirs, successors and assigns."

LENDER is defined as Horizon. LENDER RELEASING PARTIES include "LENDER, its officers, directors, shareholders, employees, agents, successors and

---

5. In *Rabatin,* the court found that defendants were joint tort-feasors where both defendants had opportunity to prevent plaintiff's injury.

assigns and their respective agents, representatives, executors, heirs, successors and assigns." LENDER RELEASED PARTIES include "LENDER, its officers, directors, shareholders, employees, agents, successors and assigns and their respective agents, representatives, executors, heirs, successors and assigns."

The parties' intent to limit the release is evinced by an explicit reservation of rights arising from the same transaction:

> This Release is not intended to waive, affect or release, nor shall it be construed as waiving, affecting or releasing any right or claim which LENDER or LENDER RELEASING PARTIES may have whether or not it has been asserted in any pending litigation, against any person, entity, association, corporation, partnership or firm other than the BORROWER RELEASED PARTIES and only to the extent released herein.

As noted above, BORROWER RELEASED PARTIES includes agents of Brokers.

The document contains an additional declaration of intent concerning the scope of the release: "no relationships other than the BORROWER ENTITIES and LENDER vis-a-vis each other are intended to be affected by this Release." The word "agents" is not included in the definition of BORROWER ENTITIES. Each person and corporation designated as a BORROWER ENTITY is a signatory to the release. Hansen and HRGT & C are not signatories. They are a "person" and a "partnership or firm" not specifically named as released.

■ However, construing the language of this reservation narrowly, so as to exclude persons otherwise within the scope of the term "agent," would produce a result contrary to the intent clearly manifested in the rest of the document. The language of a release must not be interpreted with such rigidity that it yields a result contrary to the manifest intention of the parties to the release. *Hower v. Whitmak Assoc.*, 371 Pa.Super. 443, 538 A.2d 524, 527 (1988); *Cockcroft v. Metropolitan Life Ins. Co.*, 125 Pa.Super. 293, 189 A. 687 (1937). Rather than treating the primary sections of the release as mere surplusage, the

court will construe the reservation of rights as applying to any person, firm, or corporation that is not otherwise a BORROWER RELEASED PARTY. The court concludes that any person, firm, or corporation that was acting as an agent for Brokers in the prior loan transactions comes within the scope of the release.

### b. *Meaning of the Term "Agents"*

■ The court must determine whether these defendants were "agents" as the term is ordinarily used. Noting that the word "agent" standing alone can mean a variety of things under the law, plaintiff argues that the term is not the type of "unequivocal language" required to extend a release to a non-signatory and that the fact that an attorney may, in some circumstances, act as an "agent" for his client should not foreclose further inquiry. It is true that the intent to release a non-party must be stated with such particularity that it is beyond doubt. *Schillachi v. Flying Dutchman Motorcycle Club*, 751 F.Supp. 1169, 1173 (E.D.Pa.1990). The party seeking to evade liability has the burden of establishing immunity and every intendment will be construed against him. *Employers Liability Assur. Corp v. Greenville Business Men's Ass'n*, 423 Pa. 288, 224 A.2d 620 (1966); *Schillachi v. Flying Dutchman Motorcycle Club*, 751 F.Supp. at 1173. Unequivocal language is necessary to release a non-signatory. *Sparler*, 521 A.2d at 437.

■ Defendants cite *Commonwealth, Dept. of Transp. v. Mayle*, 76 Pa.Cmwlth. 277, 463 A.2d 1239 (1983), in which the court held a release need not specifically name all parties to be released if the terms of the agreement clearly extend to them. *Id.* 463 A.2d at 1241. The limits of the holding in *Mayle* are evident in later cases. In *Hower v. Whitmak Assoc.*, the plaintiff had executed a release of "any and all persons, firms, and corporations, whether herein named or referred to or not" from all and any claims in any way related to a certain automobile accident. 371 Pa.Super. 443, 538 A.2d 524, 527–28 (1988). The court rejected defendants' argument that

they should be released even though not specifically named, holding that plaintiff's affidavit and deposition testimony regarding her understanding of the scope of the release raised an issue of material fact for the jury as to her intent in executing the release. *Id.* 538 A.2d at 528. The case at bar may be distinguished from *Hower* in that the release specifically releases the agents of a named party. The language of the release does clearly extend to Hansen and HRGT & C insofar as they were acting as agents for Brokers.

Plaintiff cites the Utah case of *Western Fiberglass, Inc. v. Kirton, McConkie & Bushnell,* 789 P.2d 34 (Utah App.1990), where the court held that the recurring combination of the word "agent" in the phrase "director, officer, employee or agent" in Utah's Business Corporations Act indicated that the terms referred to "persons operating on equal footing in the management authority of the corporation." The court concluded that the word "agent," when used in such a phrase, meant "corporate personnel who exercise management discretion and who have authority to bind the corporation, not someone like [plaintiff's former attorneys] having any type of agency relationship with the corporation." *Id.* at 39.

There are no Pennsylvania cases construing the words "officers, directors, shareholders, employees, agents" as used in the release. Pennsylvania's Business Corporations Act gives corporations the power "to elect, appoint and remove officers, employees and agents" of the corporation and to fix their compensation, define their duties, lend them money and pay them bonuses. 15 Pa.C.S.A. § 1502(16). A board of directors may remove "any officer or agent" of a corporation. 15 Pa.C.S.A. § 1733. The removal provision is set forth in Chapter 17, Subchapter B, which is titled "Directors and Officers." The word "agent," where it is used in combination with "officer" or "employee" does seem to refer to a person elected or appointed by a board of directors to exercise authority on behalf of the corporation. This court believes that

Hansen and HRGT & C do fall within such a construction of the word "agent."

Further, with all due respect for the Utah Court of Appeals, this court believes it is more appropriate to look to the ordinary meaning of the plain language used in the release rather than to titles and special provisions in the corporate code. Use of "agent" in conjunction with "officers, directors, shareholders, employees" does not compel an interpretation of the word that is considerably more limited than its ordinary, everyday meaning. The court is not persuaded that the existence of specific provisions for removing certain types of corporate agents implies that no other person is an agent of the corporation. The term, as defined by Pennsylvania law, may be fairly construed to encompass professionals outside the corporation who are entrusted with corporate authority by the officers or board of directors of the corporation.

Pennsylvania has adopted the definition of agency given in Restatement (Second) of Agency § 1 (1958): "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Mapp v. Gimbels Dept. Store,* 373 Pa.Super. 210, 540 A.2d 941, 943 (1988); *Gajkowski v. Int'l Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 350 Pa.Super. 285, 504 A.2d 840, 848 (1986); *Chalupiak v. Stahlman,* 368 Pa. 83, 81 A.2d 577 (1951). Section 14N of the Restatement includes independent contractors, such as attorneys, within the definition of "agent." *See* § 14N, Comment a ("most of the persons known as agents, that is, brokers, factors, attorneys . . . are independent contractors. . . . However, they fall within the category of agents.").

The court finds that, insofar as Hansen and HRGT & C were acting on behalf of Brokers, and were subject to Brokers' consent and control, they were acting as "agents" and are covered by the 1987 release.[6] Actions taken in such a capacity by

---

**6.** An agent may be held liable for making fraudulent misrepresentations or knowingly assisting

Hansen and HRGT & C were no different than those taken by the officers, directors, shareholders and employees of Brokers. Clearly, defendants would have been released if they were in-house counsel. The fortuity that Hansen and HRGT & C have "deeper pockets" than the settling defendants is not a consideration. It would be bad law and bad policy to hold that the officers, directors, shareholders and employees were released from liability for acting as conduits of Brokers, but Hansen and HRGT & C were not.

### c. *Claims Contemplated by the Parties*

 Releases are disfavored in law and, therefore, must be strictly construed. *Restifo v. McDonald,* 426 Pa. 5, 230 A.2d 199, 200 (1967). They only reach such claims as can fairly be said to have been within the contemplation of the parties when the release is executed. *Sparler v. Fireman's Ins. Co. of Newark, N.J.,* 360 Pa.Super. 597, 521 A.2d 433, 434, 435 (1987); *In re Jones & Laughlin Steel Corp.,* 328 Pa.Super. 442, 477 A.2d 527, 534 (1984); *Mancia v. Com., Dept. of Transp.,* 102 Pa.Cmwlth. 279, 517 A.2d 1381, 1384 (1986). The general wording of a release will not be construed to bar a claim against the third party if the claim was not known to the party at the time the release was given. *Cockcroft,* 189 A. at 687. There can be no meeting of the minds as to such claims. *See Restifo v. McDonald,* 230 A.2d at 201; *Cady v. Mitchell,* 208 Pa.Super. 16, 220 A.2d 373, 375 (1966). Plaintiff has produced evidence that it did not discover the facts supporting its claims against Hansen and HRGT & C until its post-release investigation of Brokers' activities. It also argues that defendants' admission that the release of attorneys was never discussed must lead to a conclusion that the issue was not within the contemplation

of the parties. Thus, plaintiff argues that the release should not apply to its pre-release claims against these defendants.

The court's own review of the Mutual Release reveals that the parties contemplated a release of all claims, known and unknown, against all those who participated in the prior loan transactions on behalf of either party. Insofar as Hansen and HRGT & C participated in the prior transactions as agents of Brokers, they are released. The fact that plaintiff waited until after executing the release to conduct a thorough investigation cannot change the intent of the parties as it existed at the time of execution and clearly expressed within the four corners of the document.

### 2. Parol Evidence of Intent

 Plaintiff argues that the testimony of Chitwood and Artrip shows that the parties to the release did not intend to include defendants Hansen and HRGT & C. Defendants argue that consideration of the evidence concerning the parties' intent is barred by the parol evidence rule. Plaintiff responds that defendants have no standing to raise the rule, noting that it may not be invoked by or against strangers to a document. *See Bloom v. Hilty,* 210 Pa.Super. 255, 232 A.2d 26, 29 (1967); *Carroll v. Godding,* 155 Pa.Super. 490, 38 A.2d 720 (1944); *Roesch v. Mark et ux.,* 154 Pa.Super. 188, 35 A.2d 774 (1944); *Roberts v. Cauffiel,* 283 Pa. 64, 128 A. 670, 671 (1925) ("[rule] can have no relevancy where the suit is not between the two parties to the contract, or their privies; especially where, as here, there is no attempt to affect the writing in any way"); *Com. for Irwin v. Contner,* 21 Pa. 266, 272 (1853) ("the rule which excludes parol evidence does not apply to strangers"); *Johnson v. Stewart,* 243 Pa. 485, 90 A. 349 (1914).[7] The law is the same in Georgia. In *Posey*

---

the commission of fraud by his principal, even though the fraud occurs in a transaction on behalf of the principal. Restatement (Second) of Agency, § 348 (1958).

**7.** A third-party beneficiary may produce favorable parol evidence of the circumstances surrounding an agreement or of the entire contract

between the primary parties. *Strawbridge & Clothier v. Garment Mfrs., Inc.,* 189 Pa.Super. 43, 149 A.2d 471, 473 (1959) (creditor's action against undisclosed buyer's agent); *In re Gill's Estate,* 268 Pa. 500, 112 A. 80 (1920); *In re Sewer District No. 4, Nether Providence, Tp.,* 148 Pa.Super. 7, 24 A.2d 678 (1942).

*v. Medical Center–West, Inc.*, 257 Ga. 55, 354 S.E.2d 417 (1987), the court adopted the view that the intent of the parties to a release may be proven by external evidence as against a third party claiming to benefit from the release, citing Restatement (Second) of Torts, § 885, comment d (1979), 3 A. Corbin on Contracts 572, § 596 (1960), and 4 S. Williston, Williston on Contracts 1154, § 647 (3rd ed. 1961).

However, "the exception applies only where the suit is not between the parties who have put their agreement into writing or those claiming under or through them." *Title Holding Co. v. Black*, 306 Pa. 352, 159 A. 560 (1932); *Bloom v. Hilty*, 210 Pa.Super. 255, 232 A.2d 26, 29 (1967) ("The rule applies to actions between the parties to an instrument and their representatives or those claiming under them...."). In the case at bar, defendants are not third parties claiming the benefit of a general release. They claim to be released under the release of Brokers, not as an independent third party. They are no more strangers to the release than are the officers, directors or employees of the parties to the document.

■ Plaintiff further argues that the parol evidence is admissible to explain the intent of the parties. When the intent of the parties to a release is unclear on the face of the document, Pennsylvania courts will look to extrinsic evidence, including the circumstances surrounding execution of the contract and the parties' prior course of dealings. *Commonwealth, Dept. of Transp. v. Mosites Constr. Co.*, 90 Pa. Cmwlth. 33, 494 A.2d 41, 43 (1985); *Castellucci v. Columbia Gas of Pennsylvania, Inc.*, 226 Pa.Super. 288, 310 A.2d 331 (1973); *Windsor Mfg. Co. v. S. Makransky & Sons*, 322 Pa. 466, 186 A. 84 (1936).[8] In such a case, the court should also consider the allegations of the signatories as to their intent. *Hertzog v. Jung*, 363 Pa.Super.

439, 526 A.2d 425 (1987). This is not such a case. The court has found that the document clearly expresses the intent of the parties to release the agents of Brokers. "Agents" is not an ambiguous term. There are no grounds upon which the court may consider plaintiff's parol evidence.[9]

### D. *Claims Surviving the 1987 Mutual Release*

■ The Release does not absolve Hansen and HRGT & C from liability for any acts or omissions occurring after execution of the release. Further, it does not absolve Hansen and HRGT & C from liability for actions taken beyond the scope of their agency relationship with the settling defendants. Hansen and HRGT & C remain liable for actions taken for their own account or benefit. This does not include all transactions where Hansen and HRGT & C received legal fees for services rendered. Payment for those services is no different than the receipt of salary by corporate officers and employees. Only those transactions in which plaintiff has alleged that Hansen and HRGT & C themselves retained proceeds rightfully belonging to plaintiff are not covered by the release. Except for tort claims arising from the opinion letters, as discussed *infra*, Hansen and HRGT & C are entitled to summary judgment on all other claims of pre-release fraudulent misrepresentation, negligent misrepresentation, conversion and RICO claims.

### E. *The Opinion Letters*

■ Defendants claim that as attorneys for Brokers, not Horizon, they had no duty to disclose their client's affairs and go so far as to assert that their attorney-client relationship with Brokers prohibited them from disclosing certain facts to Horizon. Defendants' argument ignores the fact that, by giving the opinion letters for plain-

**8.** Parol evidence may be considered to explain ambiguous terms used in a release but may not be admitted to add terms. *Powell v. Powell*, 244 Pa.Super. 264, 367 A.2d 314, 318 (1976).

**9.** Defendants also argue that plaintiff's evidence of the signatories' intent is inadmissible hear-

say. Plaintiff maintains that the evidence is admissible as a non-hearsay admission of a party opponent under Fed.R.Evid. 801(d)(2). Having concluded that consideration of the evidence is barred by the parol evidence rule, the court need not reach this issue.

tiff's benefit, they assumed a duty to plaintiff independent of their relationship to their clients.

Both Pennsylvania and Georgia recognize a cause of action for negligent misrepresentation in business transactions as set forth in § 552 of the Restatement (2d) of Torts (1977)[10]. *Robert & Co. Associates v. Rhodes–Haverty Partnership,* 250 Ga. 680, 300 S.E.2d 503 (1983); *Eisenberg v. Gagnon,* 766 F.2d 770, 778 (3d Cir.1985); *Mill–Mar, Inc. v. Statham,* 278 Pa.Super. 296, 420 A.2d 548, 550 (1980). Under this theory, liability is not based on the breach of duty a professional owes his clients or others in privity, but on an independent duty to plaintiff based on Hansen and HRGT & C's manifest awareness of plaintiff's reliance on the opinion and intention that the plaintiff so rely. *Robert & Co.,* 250 Ga. at 682–83, 300 S.E.2d 503; *Eisenberg,* 766 F.2d at 770.

The opinion letters expressly stated that they were issued for the benefit of plaintiff. As such, they may support a tort action for negligent misrepresentation. Because plaintiff also alleges that the misrepresentations in the letters were willfully made, they may also support a cause of action for fraud under O.C.G.A. § 51–6–2. *See Robert & Co.,* 250 Ga. at 680–81, 300 S.E.2d 503. Thus, all the opinion letters are actionable under counts three and four of the complaint.

Hansen and HRGT & C's liability for violating a duty established by the letters is not based on their participation in misconduct with the settling defendants, but on their failure to exercise due care in supplying the opinion letters. Liability must be demonstrated on the basis of what Hansen and HRGT & C knew or should have known but failed to communicate in the letters. This does not mean that plaintiff may drag all of its claims against Hansen and HRGT & C in through the back door, although the facts underlying those claims may be used to establish Hansen

and HRGT & C's knowledge. Any alleged misrepresentation or fraud outside of the opinion letters that occurred prior to the Mutual Release is covered by the Release.

Defendants claim that only the alleged misrepresentations in HRGT & C's September 4, 1987 opinion letter are actionable because that letter and the Restated Agreement constituted a novation and revocation of the prior agreements and opinion letters as a matter of law. The court finds that there was no contract between plaintiff and Hansen and HRGT & C. Defendants were not a party to any of the loan agreements. The opinion letters are actionable in tort, not in contract. The purported revocation of the loan contracts has no bearing on plaintiff's cause of action for breach of an independent duty running from HRGT & C to plaintiff.

Count five of the complaint concerns "misrepresentations and/or breaches of warranty," in the opinion letters. Defendants are entitled to summary judgment on this count, not because of any novation or revocation of the earlier agreements or letters, but because count five is a contract claim. As noted above, the opinion letters are actionable under counts three and four.

Hansen and HRGT & C also claim that the September 4, 1987 opinion letter is not actionable because plaintiff's allegations of misrepresentation, at most, amount to the non-disclosure of harmless information. Defendants also argue that it was unreasonable for plaintiff to rely on representations made in the prior letters because the veracity of those representations was already a disputed issue between the parties. There is, however, a dispute of fact as to when plaintiff learned the extent of HRGT & C's involvement in the alleged fraudulent scheme. As noted above, the existence of the dispute over Brokers' representations made the opinion letters all the more crucial to plaintiff's closing the transactions. It does not follow from plaintiff's doubts

---

**10.** The Restatement provides:

"One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused by a justifiable reliance on the information, if he fails to exercise reasonable care or competence in obtaining or communicating that information...."

about Brokers' forthrightness that it was unreasonable for them to rely also on HRGT & C's representations.

## III. CONCLUSION

Defendants Hansen and HRGT & C are entitled to summary judgment on all claims under counts one through four that are based on acts or omissions occurring prior to execution of the 1987 Mutual Release insofar as Hansen and HRGT & C were acting as agents on behalf of the settling defendants. However, Hansen and HRGT & C are not entitled to summary judgment on any claims arising from transactions in which plaintiff alleges they also acted for their own account.

The alleged misrepresentations in all four opinion letters are actionable under counts three and four. Hansen and HRGT & C are entitled to summary judgment on count five.

Hansen and HRGT & C's motion for summary judgment [# 101–1] is GRANTED IN PART and DENIED IN PART. Hansen and HRGT & C's motion for leave to file a supplemental affidavit [# 119–1] is GRANTED IN PART and DENIED IN PART. Plaintiff is DIRECTED to amend count one of the complaint within ten (10) days of the entry of this order or count one will be dismissed.

SO ORDERED.