655 A.2d 1354

LISA PETRILLO, PLAINTIFF–RESPONDENT, v. WILLIAM G. BA-
CHENBERG, JR.; WILLIAM G. BACHENBERG, JR., TRUSTEE,
"THE TRUST", A FICTITIOUS NAME; BACHENBERG & BA-
CHENBERG, INC., AND JOHN A. MATTHEWS, DEFENDANTS,
AND BRUCE D. HERRIGEL, DEFENDANT–APPELLANT.

Argued September 26, 1994—Decided March 29, 1995.

474

*Robert DeChellis* argued the cause for appellant.

*Bertram J. Latzer* argued the cause for respondent.

*George W. Canellis* argued the cause for *amicus curiae*, New Jersey State Bar Association (*Mr. Canellis*, attorney; *Raymond A. Noble*, on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

The issue is whether under the circumstances of this case the attorney for the seller of real estate owes a duty to a potential buyer. Plaintiff, Lisa Petrillo, alleges that because of the negligence of defendant Bruce Herrigel, an attorney, she received a misleading copy of a percolation-test report that induced her to sign a contract to purchase property. At the close of plaintiff's case, the Law Division concluded that Herrigel did not owe a duty to plaintiff to provide a complete and accurate report. The Appellate Division reversed, 263 *N.J.Super.* 472, 623 *A.*2d 272 (1993). It determined that an attorney for a seller has a duty not to provide misleading information to potential buyers who the attorney knows, or should know, will rely on the information. We granted Herrigel's petition for certification, 134 *N.J.* 566, 636 *A.*2d 523 (1993), to determine whether he owed such a duty to plaintiff. We now affirm the judgment of the Appellate Division.

-I-

In 1987, Rohrer Construction (Rohrer) owned a 1.3–acre tract of undeveloped land in Union Township, Hunterdon County. Herrigel represented Rohrer in the sale of the property. Rohrer hired Heritage Consulting Engineers (Heritage) to perform percolation tests concerning a contract of sale to Land Resources Corporation

(Land Resources). Percolation tests reveal, among other things, the suitability of soil for a septic system. Union Township requires two successful percolation tests for municipal approval of a septic system.

In September and October 1987, Heritage provided Rohrer and Herrigel with copies of reports describing two series of percolation tests. The first report, dated September 24, 1987, revealed that of twenty-two tests, only one had been successful. A November 3, 1987, report showed that of eight tests conducted in October, one had been successful.

Rohrer's contract with Land Resources failed. Subsequently, Rohrer listed the property with a local real estate broker, Bachenberg & Bachenberg, Inc. In October 1988, William G. Bachenberg, Jr. (Bachenberg) of Bachenberg & Bachenberg, Inc. asked Herrigel for information concerning the listing. Herrigel told Bachenberg that "he had some perc results," and sent him a two-page document consisting of one page from each of the two Heritage reports. The first page was page one from the September 24, 1987, report; it reflected one successful test and five unsuccessful tests. The second page was culled from the November 3, 1987, report; it listed one successful and one unsuccessful test. Read together, the two pages appear to describe a single series of seven tests, two of which were successful. In fact, the property had passed only two of thirty percolation tests. The document, subsequently described as the "composite report," became part of Bachenberg's sales packet.

Herrigel admits that he possessed both Heritage reports and that he delivered the composite report to Bachenberg. Although Herrigel does not deny that he prepared the composite report, his petition for certification states: "However, there was no evidence given during plaintiff's proofs that Mr. Herrigel had in fact prepared the erroneous two-page report."

Rohrer, which apparently was experiencing financial problems, could not sell the property. In December 1988, Bachenberg and a partner, John Matthews, bought the property at a sheriff's sale for

$70,000. In January 1989, Bachenberg discussed with Rohrer the 1987 engineering reports. Rohrer declined to provide those reports to Bachenberg because Bachenberg would not reimburse Rohrer for Heritage's engineering fees.

Bachenberg listed the property for sale at $160,000. In February 1989, Petrillo expressed an interest in purchasing the property to build and operate a child day-care facility. That month, at their first meeting, Bachenberg gave Petrillo a sales packet, which included the composite report.

In June 1989, Petrillo agreed to pay Bachenberg his asking price. Herrigel represented Bachenberg in negotiating the terms of the contract with Petrillo's attorney. Nothing in the record indicates that Herrigel informed Petrillo's attorney of the test results that had been omitted from the composite report. At the insistence of Petrillo's attorney, the contract provided Petrillo with forty-five days to conduct independent soil and water tests, including percolation tests. The contract provided further that Petrillo could rescind if the percolation tests were not satisfactory to her.

In August 1989, Petrillo hired an engineering firm, Canger & Cassera, to conduct soil tests and site planning. Based on the composite report, Canger & Cassera recommended that they start site-planning work simultaneously with the conduct of percolation tests by a sub-contractor, PMK, Ferris & Perricone (PMK). PMK conducted six percolation tests, all of which failed. Consequently, PMK concluded that the site was inadequate for a septic system. Canger & Cassera stopped working on the preliminary site plan. On August 22, 1989, Petrillo notified Bachenberg that the contract was null and void.

In response, Bachenberg contracted with Heritage to design a septic system that would satisfy the municipality. Heritage designed the system, which the Hunterdon County Board of Health approved. Petrillo, however, refused to accept the design, and requested permission to conduct additional percolation tests. Bachenberg denied her request. During the course of their negotia-

tions, Herrigel sent Petrillo the complete copies of the September 24 and November 3 Heritage reports.

The parties could not settle their differences. Bachenberg refused to return Petrillo's $16,000 down payment, claiming that she had breached the contract. Petrillo sued Bachenberg, Matthews, and Herrigel for the return of the down payment and for the costs of her engineering fees. Her complaint alleged claims sounding in breach of contract, fraud, concealment, negligent misrepresentation, and conspiracy.

In the complaint, Petrillo alleged, among other things, that Herrigel's failure to provide the complete Heritage reports violated a duty that he owed to her. She claimed further that the violation had caused her to incur engineering expenses that she would not have incurred if she had known all the facts. Specifically, she contended that if she had known that the property had passed only two of thirty percolation tests, she would not have signed the contract or hired Canger & Cassera and PMK.

At the close of plaintiff's case, the trial court dismissed Petrillo's complaint against Herrigel. The court concluded that Petrillo had not alleged facts sufficient to support a duty extending from Herrigel to her. It stated:

> There are no facts dealing with any responsibility or duty that Mr. Herrigel had. He had no knowledge of what Mr. Bachenberg gave, if anything, to Miss Petrillo, and on Miss Petrillo's cross-examination she essentially said she never intended to rely on anything Mr. Herrigel provided or failed to provide and never hired Mr. Herrigel. Mr. Herrigel never gave direct information to her. Mr. Herrigel never refused to answer any questions put to him.

> Taking the mechanical function that I must apply, I find that there is no evidence that I have before me dealing with any responsibility or any breach of any duty committed by Mr. Herrigel in this transaction.

The court also dismissed Petrillo's claims against Bachenberg and Matthews for concealment. On the remaining claims, the jury determined in answer to specific interrogatories that Petrillo, based on PMK's unsuccessful percolation-test results, could have terminated her contract with Bachenberg. The jury also found that she had not terminated the contract. Finally, the jury determined that Petrillo had breached the contract by not seeking

site-plan approvals after Heritage had designed a suitable septic system, and that Bachenberg was entitled to keep the $16,000 deposit.

The Appellate Division reversed the dismissal of Petrillo's fraud claim against Bachenberg. It also reversed the judgment entered on the verdict against Petrillo because of improper jury instructions regarding her waiver of her right to terminate the contract. Those issues are not before us.

Before us, however, is the Appellate Division's reversal of the dismissal of Petrillo's claims against Herrigel for negligent misrepresentation. The Appellate Division determined that a seller's attorney owes a duty to a non-client buyer "who the attorney knows or should know would rely on the attorney in his or her professional capacity." 263 *N.J.Super.* at 483, 623 *A.*2d 272. It stated that "a buyer of real estate has a cause of action against an attorney for the seller who provides misleading information concerning the subject of the transaction." *Id.* at 487, 623 *A.*2d 472. The court concluded that a jury could have found that when Herrigel gave Bachenberg the composite report, Herrigel should have known that Bachenberg would provide the report to a prospective purchaser, such as Petrillo, who would rely on the report in deciding whether to purchase the property. *Ibid.*

–II–

As a claim against an attorney for negligence resulting in economic loss, Petrillo's claim against Herrigel is essentially one for economic negligence. Formerly, the doctrine of privity limited such claims by non-clients against attorneys and other professionals. Jay M. Feinman, *Economic Negligence: Liability of Professionals and Businesses to Third Parties for Economic Loss* 29 (1995). More recently, other doctrines have replaced privity as a means of limiting a professional's duty to a non-client. *See, e.g., Biakanja v. Irving,* 49 *Cal.*2d 647, 320 *P.*2d 16 (1958) (adopting a "balance of factors" test).

 The determination of the existence of a duty is a question of law for the court. *Wang v. Allstate Ins. Co.,* 125 *N.J.* 2, 15, 592 *A.*2d 527 (1991); *Strachan v. John F. Kennedy Memorial Hosp.,* 109 *N.J.* 523, 529, 538 *A.*2d 346 (1988). Whether an attorney owes a duty to a non-client third party depends on balancing the attorney's duty to represent clients vigorously, *Rules of Professional Conduct, Rule* 1.3 (1993), with the duty not to provide misleading information on which third parties foreseeably will rely, *Rules of Professional Conduct, Rule* 4.1 (1993). *See also Restatement of the Law Governing Lawyers* § 73 comment b (Tentative Draft No. 7, 1994) (discussing rationale for imposing duty to non-clients); Stephen Gillers, *Regulation of Lawyers* 656–64 (3d ed. 1992) (discussing duty to non-clients); Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 1.1:203, § 2.3:102 (2d ed. 1990) (same). Because this matter arises on the grant of defendant Herrigel's motion to dismiss, we accord Petrillo the benefit of all favorable inferences that may be drawn from her proofs. *R.* 4:37–2(b); *Bozza v. Vornado, Inc.,* 42 *N.J.* 355, 357, 200 *A.*2d 777 (1964).

Although we have not previously addressed the issue of attorney liability to third parties, the Appellate Division has recognized that attorneys may owe a limited duty in favor of specific non-clients. In *Stewart v. Sbarro,* 142 *N.J.Super.* 581, 585, 362 *A.*2d 581, *certif. denied,* 72 *N.J.* 459, 371 *A.*2d 63 (1976), an attorney for the buyers of a corporation agreed to obtain the buyers' signatures on a bond and mortgage indemnifying the sellers against liability for existing corporate debt. The attorney failed to obtain the required signatures. As a result, the debt was unsecured, rather than secured. *Id.* at 586–87, 362 *A.*2d 581. When the buyers filed a bankruptcy petition, the sellers sued their own attorney, the buyers, and the buyers' attorney for the unpaid debt. The Appellate Division determined that the buyers' attorney could be liable in negligence for breaching a duty to the sellers. *Id.* at 593, 362 *A.*2d 581. It reasoned that when an attorney should foresee that a third party may rely on the attorney's promise to act, a duty attaches. *Ibid.*

Similarly, in *Albright v. Burns,* 206 *N.J.Super.* 625, 503 *A.*2d 386 (1986), the Appellate Division held that an attorney was liable to a decedent's estate when the attorney knowingly facilitated improper transactions involving the holder of the decedent's power of attorney. The court stated that "a member of the bar owes a fiduciary duty to persons, though not strictly clients, who he knows or should know rely on him in his professional capacity." *Id.* at 632–33, 503 *A.*2d 386.

More recently, in *R.J. Longo Construction Co. v. Schragger,* 218 *N.J.Super.* 206, 527 *A.*2d 480 (1987), the Appellate Division considered a case involving township attorneys who had prepared bid documents for a sewer-construction contract. The attorneys had failed to obtain certain easements mentioned in the bid package. *Id.* at 207–08, 527 *A.*2d 480. Consequently, the successful bidder, plaintiff, R.J. Longo Construction Co. (Longo), which had begun construction on notice to proceed from the town, was forced to stop work. As a result, Longo suffered losses and sued the attorneys. *Id.* at 208, 527 *A.*2d 480. The trial court dismissed the claims against the township attorneys because of the absence of privity. *Ibid.* The Appellate Division reversed. It held that Longo was an intended third-party beneficiary of the defendant attorneys' employment contracts with the township. *Id.* at 210, 527 *A.*2d 480. The court determined that the attorneys owed the contractor a fiduciary duty and that they were liable for the foreseeable consequences of their negligent misrepresentations on which plaintiff reasonably and foreseeably relied. *Id.* at 209–10, 527 *A.*2d 480.

Other jurisdictions similarly have relaxed traditional privity requirements when an attorney induces specific non-clients to rely on the attorney's representations. For example, in *Greycas, Inc. v. Proud,* 826 *F.*2d 1560, 1561–62 (7th Cir.1987), *cert. denied,* 484 *U.S.* 1043, 108 *S.Ct.* 775, 98 *L.Ed.*2d 862 (1988), Greycas, a finance company, agreed to lend funds to an Illinois borrower if the borrower provided an attorney's opinion letter stating that the borrower's collateral was not subject to prior liens. The borrower

asked an attorney, his brother-in-law, to prepare the needed opinion letter. *Id.* at 1562. The attorney prepared the letter based solely on the borrower's representations and submitted it to Greycas, which promptly issued the funds. *Ibid.* After the borrower defaulted, Greycas learned that most of the borrower's collateral was subject to superior liens and that the loan was largely unsecured. *Ibid.* Greycas sued the attorney for negligent misrepresentation. The court concluded under Illinois law that the attorney owed Greycas a duty not to negligently misrepresent the status of the borrower's collateral notwithstanding the lack of privity. *Id.* at 1564–65; *see also Horizon Financial, F.A. v. Hansen,* 791 *F.Supp.* 1561, 1573–75 (N.D.Ga.1992) (holding under Pennsylvania law that attorney for borrower has duty to lender bank to whom attorney issued opinion letters expressly for bank's benefit); *Mehaffy, Rider, Windholz & Wilson v. Central Bank Denver, N.A.,* 892 *P.2d* 230, 237 (Colo. January 30, 1995) ("by issuing legal opinion letters for the purpose of inducing [reliance], the attorneys may be liable ... for negligent misrepresentation"); *McEvoy v. Helikson,* 277 *Or.* 781, 562 *P.2d* 540, 543 (1977) (holding that attorney for ex-wife owed duty to former husband when attorney undertook to enforce court order obligating him to hold ex-wife's passport unless she relinquished custody of children); *Trask v. Butler,* 123 *Wash.2d* 835, 872 *P.2d* 1080, 1084 (1994) (stating that "[t]he intent to benefit the plaintiff is the first and threshold inquiry" in determining existence of duty to non-clients).

The New York Court of Appeals has likewise held that an attorney may owe a duty to specific non-clients who rely on the attorney's representations. See *Prudential Insurance Co. of America v. Dewey Ballantine, Bushby, Palmer & Wood,* 80 *N.Y.2d* 377, 590 *N.Y.S.2d* 831, 605 *N.E.2d* 318 (1992). In *Prudential,* a lender sued a borrower's attorney for negligently preparing an opinion letter that was provided to the lender as a condition to a debt restructuring. An attorney could be liable to a non-client for negligent misrepresentation, the court conceded, if the nature of the relationship between the attorney and the non-client was "so close as to approach that of privity." *Id.* 590 *N.Y.S.2d* at 833,

605 *N.E.*2d at 320. The court stated the criteria for finding a duty:

> (1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance.
>
> [*Id.*, at 384, 590 *N.Y.S.*2d at 834–35, 605 *N.E.*2d at 321–22 (citing *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 *N.E.*2d 110 (1985)).]

The court concluded that the attorney knew that the lender would rely on the opinion letter and intended to induce that reliance. *Id.*, 590 *N.Y.S.*2d at 8, 605 *N.E.*2d at 322. *See also Vereins–Und Westbank, AG v. Carter*, 691 *F.Supp.* 704, 708–16 (S.D.N.Y.1988) (holding under New York law that lawyer owes duty to non-clients to whom lawyer furnishes legal opinion on behalf of client).

█ Thus, when courts relax the privity requirement, they typically limit a lawyer's duty to situations in which the lawyer intended or should have foreseen that the third-party would rely on the lawyer's work. *See* Feinman, *supra*, at 131–34. For example, a lawyer reasonably should foresee that third parties will rely on an opinion letter issued in connection with a securities offering. *See Norman v. Brown, Todd & Heyburn*, 693 *F.Supp.* 1259, 1265 (D.Mass.1988) ("As a general matter, tax opinion letters are drafted so that someone can rely upon them."). The purpose of a legal opinion letter is to induce reliance by others. If an attorney foresees or should foresee that reliance, the resulting duty of care can extend to non-client third parties. *In re Rexplore, Inc. Sec. Litig.*, 685 *F.Supp.* 1132, 1146 (N.D.Cal.1988). *See also Norman, supra*, 693 *F.Supp.* at 1265 (holding that Massachusetts law imposes duty when reliance is reasonably foreseeable). *But see Austin v. Bradley, Barry & Tarlow, P.C.*, 836 *F.Supp.* 36, 38, 40–41 (D.Mass.1993) (holding that Massachusetts law imposes no duty unless attorneys have actual knowledge of specific third-party reliance); *Alpert v. Shea Gould Climenko & Casey*, 160 *A.D.*2d 67, 73, 559 *N.Y.S.*2d 312, 315–16 (1990) (denying existence of fiduciary duty in absence of evidence that lawyers actually knew and understood that non-client investors would rely on tax-opinion letters issued in connection with tax-shelter offering).

In other contexts, courts have imposed a duty on an attorney who prepares an instrument with the intent that third parties will rely on it. Thus, in *Molecular Technology Corp. v. Valentine*, 925 *F.*2d 910, 915–17 (1991), the Sixth Circuit Court of Appeals determined that a lawyer who prepared a private offering statement for his client's corporate debentures owed a duty of care to potential investors whom the attorney knew, or should have known, would rely on the statement. The court held that Michigan law "imposes a duty in favor of all those third parties who defendant knows will rely on the information *and* to third parties who defendant should reasonably foresee will rely on the information." *Id.* at 916. *But see In re Rospatch Sec. Litig.*, 760 *F.Supp.* 1239, 1261 (W.D.Mich.1991) (distinguishing *Molecular Technology*, which involved closely-held corporation, from cases involving securities offerings of large, publicly-held corporations).

Likewise, in *Century 21 Deep South Properties, Ltd. v. Corson*, 612 *So.*2d 359 (Miss.1992), a buyer of real property sued alleging negligence of the attorney for the seller, who had conducted a title search on which the buyer had detrimentally relied. The Mississippi Supreme Court held that "an attorney performing title work will be liable to reasonably foreseeable persons who, for a proper business purpose, detrimentally rely on the attorney's work." *Id.* at 374.

Similarly, section 73 of the proposed *Restatement of the Law Governing Lawyers, supra*, pertaining to "duty to certain non-clients," provides:

For the purposes of liability ..., a lawyer owes a duty to use care ...:

\* \* \*

(2) To a non-client when and to the extent that the lawyer or (with the lawyer's acquiescence) the lawyer's client invites the non-client to rely on the lawyer's opinion or provision of other legal services, the non-client so relies, and the non-client is not, under applicable law, too remote from the lawyer to be entitled to protection....

We also recognize that attorneys may owe a duty of care to non-clients when the attorneys know, or should know, that non-clients will rely on the attorneys' representations and the non-clients are not too remote from the attorneys to be entitled to

protection. The *Restatement's* requirement that the lawyer invite or acquiesce in the non-client's reliance comports with our formulation that the lawyer know, or should know, of that reliance. No matter how expressed, the point is to cabin the lawyer's duty, so the resulting obligation is fair to both lawyers and the public.

–III–

The imposition on attorneys of defined liability to third parties comports with general principles of tort law. In effect, section 552 of the *Restatement (Second) of Torts* (1977) imposes pecuniary liability for negligent misrepresentation when an attorney "supplies false information for the guidance of others in their business transactions, . . . if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Id.* at s. 552(1). The same section limits liability to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

[*Id.* at s. 552(2).]

Applying section 552, we have determined that shareholders who acquired a corporation's stock in a merger could maintain a negligence action against a certified public accountant who negligently had prepared financial statements of the merging corporation. See *H. Rosenblum, Inc. v. Adler,* 93 *N.J.* 324, 461 *A.2d* 138 (1983). Because investors foreseeably may rely on certified financial statements, we held that the accountant's duty extended to those investors despite the absence of privity between them. See *id.* at 352–53, 461 *A.2d* 138.

Mindful of the danger of potentially-unlimited liability, however, we limited the accountant's liability, stating that the investors

would have to establish that they received the audited statements from the company pursuant to a proper company purpose, that they, in accordance with that purpose, relied on the statements and that the misstatements therein were due to the auditor's negligence and were a proximate cause of the [investor's] damage.

[*Id.* at 350, 461 *A.2d* 138 (citations omitted).]

On March 17, Governor Christine Todd Whitman signed into law Senate Bill No. 826, which limits accountant's liability to third parties for the accountant's negligent acts. *Senate Commerce Committee Statement to S. No. 826.* The bill, however, does not affect the application of section 552 to other professionals, such as attorneys.

The Appellate Division already has extended our holding in *Rosenblum* to situations involving an attorney and third parties who foreseeably rely on the attorney's opinion or other legal services. *Zendell v. Newport Oil Corp.*, 226 *N.J.Super.* 431, 544 *A.*2d 878 (1988). In *Zendell,* the plaintiffs invested in unregistered limited partnerships organized to engage in gas and oil exploration. The attorneys assisted in organizing and selling the partnership interests. *Id.* at 438, 544 *A.*2d 878. When the partnership failed, the plaintiffs sought rescission, alleging violations of federal and state securities-registration requirements. *Id.* at 435, 544 *A.*2d 878. Specifically, the plaintiffs alleged that the attorneys had been negligent by "allowing an offering of unregistered securities...." *Id.* at 439, 544 *A.*2d 878. Reversing a summary judgment for the attorneys, the Appellate Division held that "[p]laintiff's negligence claim against [the attorneys] ... is cognizable under *Rosenblum.*" *Ibid.* Thus, like certified public accountants or other professionals involved in commercial transactions, a lawyer's duty may run to third parties who foreseeably rely on the lawyer's opinion or other legal services.

–IV–

The objective purpose of documents such as opinion letters, title reports, or offering statements, and the extent to which others foreseeably may rely on them, determines the scope of a lawyer's duty in preparing such documents. *Rosenblum, supra,* 93 *N.J.* at 352–53, 461 *A.*2d 138. As the court observed in *Norman, supra,* 693 *F.Supp.* at 1265, the objective purpose of a tax-opinion letter issued in connection with a public offering is to

induce potential investors to rely on the letter's characterization of the investment's tax consequences.

Here, Herrigel did not prepare an opinion letter. Giving Petrillo the benefit of all reasonable inferences, however, we infer that Herrigel extracted information from existing percolation-test reports, created the composite report, and delivered the report to a real estate broker. Our initial inquiry, as with an opinion letter or comparable document, is to ascertain the purpose of the report.

Although Herrigel may have intended that the composite report would demonstrate only that the property had passed two percolation tests, his subjective intent may not define the objective meaning of the report. The roles and relationships of the parties color our assessment. In making that assessment, we cannot ignore the fact that Herrigel is an attorney who, in connection with his client's efforts to sell the property, provided the report to a real estate broker. We infer that when he delivered the report to Bachenberg, Herrigel knew, or should have known, that Bachenberg might deliver it to a prospective purchaser, such as Petrillo. Herrigel did nothing to restrict a prospective purchaser's foreseeable use of the report. In neither the report, a covering letter, nor a disclaimer did Herrigel even hint that the report was anything but complete and accurate.

Significantly, Herrigel's involvement continued after he delivered the report to Bachenberg. After Bachenberg purchased the property, Herrigel acted as his lawyer and negotiated the terms of the contract for the sale of commercial property to Petrillo. Although compiling an engineering report to help a client sell real estate may not be part of a lawyer's stock-in-trade, representing the seller of real estate is a traditional legal service. By representing Bachenberg on the sale to Petrillo, Herrigel confirmed the continuity of his involvement as a lawyer. On these facts, Herrigel's continuing involvement permits the inference that the objective purpose of the report was to induce a prospective purchaser to buy the property. His involvement supports the further infer-

ence that Herrigel knew that Bachenberg intended to use the report for that purpose.

Furthermore, a purchaser reading the composite report reasonably could conclude that the property had passed two of seven, not two of thirty, percolation tests. Based on that conclusion, a purchaser reasonably could decide to sign a purchase contract, although the purchaser would not have signed the contract if he or she had seen the complete set of percolation reports. So viewed, Herrigel should have foreseen that Petrillo would rely on the total number of percolation tests in deciding whether to sign the purchase contract. In sum, a jury reasonably could infer that the composite report misrepresented material facts.

By providing the composite report to Bachenberg and subsequently representing him in the sale, Herrigel assumed a duty to Petrillo to provide reliable information regarding the percolation tests. Herrigel controlled the risk that the composite report would mislead a purchaser. Fairness suggests that he should bear the risk of loss resulting from the delivery of a misleading report. We further conclude that Herrigel should have foreseen that a prospective purchaser would rely on the composite report in deciding whether to sign the contract and proceed with engineering and site work.

Herrigel easily could have limited his liability. Most simply, he could have sent complete copies of both reports to Bachenberg. Alternatively, Herrigel could have sent a letter to Bachenberg stating that the property had passed two successful percolation tests as required by Union Township. Or he could have stated either in a letter to Bachenberg or in the composite report that the report evidenced only that the property had yielded two successful percolation tests and that no one should rely on the report for any other purpose. Because Herrigel did nothing to limit the objective purpose of the composite report, he should have foreseen that Petrillo, as a prospective purchaser, would rely on the facts set forth in the report. Accordingly, Herrigel's duty extends to Petrillo. Given Petrillo's concern about percolation, a

concern she expressed in the contract, Herrigel's duty includes the obligation to provide information about unsuccessful, as well as successful, percolation tests.

Our decision to affirm the reversal of the judgment of dismissal for Herrigel does not mean that a jury may not return a verdict in his favor. A jury might find that Petrillo was interested only in the fact that the property had passed two percolation tests. Alternatively it could find that the omission of the undisclosed test results was neither material nor misleading. We do not resolve these or other factual issues that may arise on remand. We decide only that a jury should have the opportunity to determine the issue of the effect of Herrigel's alleged negligent misrepresentation.

Our dissenting colleague accepts both our fundamental legal analysis and our conclusion that a jury could find Herrigel to have been negligent. The dissent, however, concludes as a matter of law that Herrigel could not have foreseen that Petrillo would have relied on the composite report when contracting to purchase the property from Bachenberg. Only by ignoring Herrigel's continuous involvement with Bachenberg may the dissent sustain its conclusion.

Contrary to the dissent, a jury reasonably could conclude that when he delivered the report to Bachenberg, Herrigel should have foreseen that Bachenberg, in trying to sell the property, would deliver it to a prospective purchaser. A jury could reach that conclusion notwithstanding the change in Bachenberg's role from agent to principal. As both realtor and investor, Bachenberg's goal was to sell the property. A jury could find that Herrigel should have foreseen that Bachenberg would transmit the composite report to a prospective purchaser, such as Petrillo. Given Herrigel's continuing relationship with Bachenberg, the four-month lapse between Herrigel's delivery of the report to Bachenberg and Bachenberg's delivery to Petrillo is not so great as to render Petrillo's receipt of the report unforeseeable as a matter of law. Neither is the potential class of recipients of the report so

vast that we expose Herrigel to boundless risk by recognizing that he owed a duty to Petrillo. Nor is Herrigel, linked by his relationship with Bachenberg, so remote from Petrillo that we can conclude as a matter of law that the chain of events "makes her too remote from Herrigel for him to have foreseen harm to her." *Post* at 497, 655 *A*.2d at 1367.

We further disagree with the dissent's unsupported conjecture that recognizing a duty extending from Herrigel to Petrillo will make lawyers less accessible and more defensive. Nor will the duty lead to legal services that are more cumbersome and costly. *Post* at 489, 655 *A*.2d at 1362. Recognition of that duty, however, may protect innocent third parties from negligent misrepresentations by lawyers. The recognized duty hardly constitutes lawyers as "guarantors of the accuracy of surveys or other similar experts' reports that they merely transmit." *Post* at 496, 655 *A*.2d at 1366. We do not hold that Herrigel guaranteed the accuracy of the tests. Our holding goes no further than to state that Herrigel had a duty not to misrepresent negligently the contents of a material document on which he knew others would rely to their financial detriment. In many situations, lawyers, like people generally, may not have a duty to act, but when they act, like other people, they should act carefully.

The judgment of the Appellate Division is affirmed.

STEIN, J., concurring.

I join the Court's opinion and write separately only to emphasize that in my view the Court's decision effects no material change in the liability of lawyers or other professionals to third parties. Accordingly, the calamitous consequences forecast by our dissenting colleague vastly overstate the effect of our holding and ignore its exceptional factual predicate.

The context in which the case arose emphasizes the limited contours of the Court's holding. Defendant Herrigel, while representing a former owner of the property in question, prepared a composite of various percolation tests and transmitted the compos-

ite report to William G. Bachenberg, Jr. (Bachenberg) who later acquired the property. Concededly, the composite report did not accurately reflect the results of all of the percolation tests that had been done on the property.

Subsequently, when Bachenberg began negotiating the contract to sell the property to plaintiff, Lisa Petrillo, Herrigel was engaged to represent Bachenberg. Among the materials that Bachenberg furnished Petrillo was the composite percolation report. As the majority points out, "[N]othing in the record indicates that Herrigel informed Petrillo's attorney of the test results that had been omitted from the composite report." Ante at 476, 655 A.2d at 1356.

Under those specific circumstances, the Court concludes that "by providing the composite report to Bachenberg and subsequently representing him in the sale, Herrigel assumed a duty to Petrillo to provide reliable information regarding the percolation test." Ante at 487, 655 A.2d at 1361. It will come as no surprise to the bar that the Court has decided that a properly instructed jury could conclude that Herrigel should have foreseen that the composite report would have been delivered to Petrillo and that she would have relied on it to her detriment. Because of the rather uncommon factual basis on which the Court's decision rests, the likelihood that it will have a significant impact on the professional liability of lawyers to third parties is minimal indeed.

GARIBALDI, J., dissenting.

The majority imposes on an attorney a duty of care to a non-client broader than that imposed on an attorney under the proposed *Restatement of the Law Governing Lawyers* § 73 (Tentative Draft No. 7, 1994), under the *Restatement (Second) of Torts* § 552 (1977), and under our case law, including *Rosenblum v. Adler*, 93 *N.J.* 324, 461 A.2d 138 (1983). Such an extension will lead to defensive lawyering; it will make legal services more cumbersome, more costly, and less accessible to clients.

I agree with the proposed *Restatement of the Law Governing Lawyers* § 73, pertaining to "duty to certain non-clients," that provides:

> For the purposes of liability ..., a lawyer owes a duty to use care ...:
>
> (2) To a non-client when and to the extent that the lawyer or (with the lawyer's acquiescence) the lawyer's client invites the non-client to rely on the lawyer's opinion or provision of other legal services, the non-client so relies, and the non-client is not, under applicable law, too remote from the lawyer to be entitled to protection.
>
> [*Restatement of the Law Governing Lawyers* § 73 (Tentative Draft No. 7, 1994).]

Comments b and c to section 73 disclose the limited circumstances in which an attorney's duty to a non-client arises.

> Making lawyers liable to non-clients, moreover, could tend to discourage lawyers from vigorous representation. Hence, a duty of care to non-clients arises only in the limited circumstances described in the Section and must be applied in light of those conflicting concerns.
>
> ....
>
> Similarly, a lawyer representing a client in an arm's-length business transaction does not owe a duty of care to opposing non-clients, except in the exceptional circumstances described in this Section.
>
> [*Id.* at comments b, c.]

Comment e to section 73 describes the type of case in which an attorney may owe a duty to a non-client:

> The lawyer's client typically benefits from the non-client's reliance, for example, because provision of the opinion was required in order to comply with a contractual obligation of the client, and the client cannot properly object to recognition of such a claim on the ground that it conflicts with duties the lawyer owed to the client.
>
> ....
>
> Clients or lawyers may invite non-clients to rely on a lawyer's legal opinion or services.... For example, a sales contract may provide that the seller's lawyer will provide the buyer with an opinion letter stating that, upon investigation, the lawyer found no security interests encumbering the property being sold.... Often, a non-client will require such an opinion letter as a condition for transacting with a lawyer's client. A lawyer's opinion may state the results of a lawyer's investigation and analysis of facts as well as the lawyer's legal conclusions.
>
> ....
>
> In some circumstances, reliance by many unspecified persons may be invited, as when a lawyer writes an opinion letter concerning a securities offering that is reasonably relied on by purchasers.
>
> [*Id.* at comment e.]

I agree with the majority that "[t]he purpose of the legal opinion letter is to induce reliance by others. If an attorney foresees or should foresee that reliance, the resulting duty of care can extend to non-client third parties." *Ante* at 482–483, 655 *A.*2d at 1359. *See Zendell v. Newport Oil Corp.*, 226 *N.J.Super.* 431, 544 *A.*2d 878 (App.Div.1988) (holding that attorneys who had assisted in organizing and presenting for sale unregistered limited partnerships are liable to plaintiffs who invested in the unsuccessful partnerships); *Greycas, Inc. v. Proud*, 826 *F.*2d 1560 (7th Cir.1987), *cert. denied*, 484 *U.S.* 1043, 108 *S.Ct.* 775, 98 *L.Ed.*2d 862 (1988) (finding that attorney who prepared opinion letter stating that borrower's collateral was not subject to prior liens owed Greycas, the creditor who relied on that opinion letter, a duty not to misrepresent negligently the status of borrower's collateral); *Horizon Financial, F.A. v. Hansen*, 791 *F.Supp.* 1561, 1573–75 (N.D.Ga.1992) (concluding that, under Pennsylvania law, attorney for borrower has duty to lender bank to whom attorney issued opinion letters expressly for bank's benefit); *Mehaffy, Rider, Windholz & Wilson v. Central Bank Denver, N.A.*, 892 *P.*2d 230 (1995) (holding that "by issuing legal opinion letters for the purpose of inducing [reliance], the attorneys may be liable ... for negligent misrepresentation"); *Prudential Insurance Co. of America v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 *N.Y.*2d 377, 590 *N.Y.S.*2d 831, 605 *N.E.*2d 318 (1992) (holding borrower's attorney liable to lender for negligently preparing opinion letter that was provided to lender as condition to debt restructuring). *See also* cases cited by majority, *ante* at 483, 655 *A.*2d at 1359.

An attorney who undertakes a specific task for a non-client who the attorney knows will rely on that specific task also owes a duty of care to that non-client. As Comment e to section 73 of the proposed *Restatement of the Law Governing Lawyers, supra*, states:

> When a non-client is invited to rely on a lawyer's services, rather than on the lawyer's opinions, the analysis is similar. For example, if the seller's lawyer at a real-estate closing offers to record the deed for the buyer, the lawyer is subject to

liability to the buyer for negligence in doing so, even if the buyer did not thereby become a client of the lawyer and the lawyer, for example, owes the buyer no duty of confidentiality.

[*Restatement of the Law Governing Lawyers* § 73, *supra*, comment e.]

Our courts have already recognized this sort of duty to non-clients. *See R.J. Longo Construction Co. v. Schragger*, 218 *N.J.Super.* 206, 527 *A.*2d 480 (App.Div.1987) (holding that township attorneys who had failed to obtain certain easements mentioned in sewer-construction contract's bid package, and who had thus forced the contractor to stop construction and suffer losses, were liable for foreseeable consequences of their negligent misrepresentations on which contractor had reasonably and foreseeably relied); *Stewart v. Sbarro*, 142 *N.J.Super.* 581, 362 *A.*2d 581 (App.Div.1976), *certif. denied*, 72 *N.J.* 459, 371 *A.*2d 63 (1976) (holding that buyers' attorney who agreed to obtain buyers' signatures on a bond and mortgage indemnifying sellers against liability for existing corporate debt, but who failed to obtain those required signatures, was liable in negligence for breaching a duty to sellers).

Like the majority, I rely on *Rosenblum, supra*, 93 *N.J.* at 324, 461 *A.*2d 138. In *Rosenblum*, we applied section 552 of the *Restatement (Second) of Torts, supra*, which limits liability for negligent misrepresentation to "the person or one of a limited group of persons for whose benefit and guidance" information is supplied. *Id.* at 338, 461 *A.*2d 138. Those limitations were imposed so that accountants would not be subject to unlimited liabilities.

Yet this case is easily distinguishable from any of the previously cited cases, *supra* at 491–492, 655 *A.*2d at 1364, and clearly is distinguishable from the standards set forth in section 73 of the proposed *Restatement of the Law Governing Lawyers, supra*. This case does not concern a lawyer's legal opinion or the performance of any legal services. Nor does this case concern a non-client for whom an attorney has undertaken a specific legal task. Rather, this case is about an attorney's error in not continuing to follow the whereabouts of a report of a consulting engineering company that was incorrectly collated in his office and sent to the

real estate agent of his then-client, but that ended up in the hands of a subsequent non-client, from a subsequent seller of the same property.

## II

A brief recitation of the facts demonstrates what an overbroad, virtually unlimited duty of care for remote non-clients the Court has imposed on attorneys. Herrigel was the lawyer for Rohrer Construction (Rohrer). Rohrer wanted to sell the property at issue. While representing Rohrer, Herrigel sent a report of Heritage Consulting Engineers (Heritage) to Rohrer's then-real estate agent William G. Bachenberg, Jr. (Bachenberg). That report had been erroneously collated in Herrigel's office. Rohrer failed to sell the property. Bachenberg later purchased the property at a sheriff's sale. Bachenberg then decided to sell the property. At his first meeting with Lisa Petrillo (Petrillo), Bachenberg gave the miscompiled report to Petrillo. This was done solely by Bachenberg. As the trial court stated when it held that Herrigel had no duty to Petrillo, "He had no knowledge of what Mr. Bachenberg gave, if anything, to Miss Petrillo."

Thus Rohrer was the client whom Herrigel was representing when he purportedly gave the two-page report to Bachenberg, Rohrer's realtor. Petrillo was never Rohrer's prospective buyer; she was solely Bachenberg's prospective buyer. By the time Petrillo expressed interest in the property, Bachenberg was no longer the realtor but the seller.

Under section 73 of the proposed *Restatement of the Law Governing Lawyers, supra,* Herrigel has no duty to Petrillo. Herrigel did not give Petrillo a "legal opinion" or provide "other legal services" to her. Indeed, the negligence charged to Herrigel is not related to either his legal opinion or other legal services.

Nor is Herrigel liable under *Rosenblum.* In that case we held that for the third-party investors to recover from an accountant, the investors

> would have to establish that they received the audited statements from the company pursuant to a proper company purpose, that they, in accordance with that purpose, relied on the statements and that the misstatements therein were due to the auditor's negligence and were a proximate cause of the [investor's] damage.
>
> [93 *N.J.* at 350, 461 *A.*2d 138 (citations omitted).]

Applying *Rosenblum*, Petrillo would have had to receive the information from and for the benefit of Rohrer. Petrillo had no connection with Rohrer. She did not receive the report from Rohrer, nor was her reliance in furtherance of Rohrer's business purposes. It was an unforeseeable turn of events that accounted for her receipt of the report from Rohrer's former realtor, Bachenberg. While Bachenberg was the party to whom the two-page report was originally given, it was given to Bachenberg in Bachenberg's capacity as realtor for Rohrer, Herrigel's client. When Herrigel gave Bachenberg the report, it was to assist Bachenberg in the sale of the property on behalf of Rohrer; it was unforeseeable at that time that Bachenberg would later purchase the property and give the two-page report to his own prospective client.

As *Rosenblum* makes clear, a remote party is not entitled to recover from an attorney who could not have foreseen the harm to the non-client. Even if Petrillo had relied on the report, her reliance in that later transaction with a different owner makes her too remote for Herrigel to have foreseen harm to her. Foreseeability of harm to a non-client is one of the factors the *Stewart* court considered in balancing an attorney's liability to a non-client; the other factors are

> the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.
>
> [*Stewart v. Sbarro, supra,* 142 *N.J.Super.* at 593, 362 *A.*2d 581 (quoting *Donald v. Garry,* 19 *Cal.App.*3d 769, 771–72, 97 *Cal.Rptr.* 191, 192 (1971) (quotations omitted)).]

Nor is Herrigel liable under *Stewart.* Herrigel had no duty to Petrillo. There was no intent to affect Petrillo. She was not a party to the transaction for which Herrigel sent the report to

Bachenberg. She was not a purchaser from Rohrer. Moreover, Petrillo suffered no injury as a result of Herrigel's action. *Post* at 497–498, 655 *A*.2d at 1366–1367.

Nor was there the requisite closeness of connection between Herrigel's conduct and Petrillo's alleged injury. Certainly no moral blame attaches to the erroneous collating of a report by an attorney or someone in his office. Petrillo is not claiming that Herrigel committed an act of fraud. I agree with the Appellate Division "that any claimed misconduct by Herrigel was far too ambiguous or speculative to rise to the level of dishonesty contemplated by the foregoing Rules of Professional Conduct." 263 *N.J.Super.* 472, 483, 623 *A*.2d 272 (1993) (referring to *RPC* 4.1 ("Truthfulness in Statements to Others") and *RPC* 8.4 ("Misconduct")).

Nor do I think that the majority's policy decision will prevent future harm. Under the majority's opinion, an attorney may owe a professional duty to non-clients to oversee the care used in collating pages from their law office files. While an attorney should not be exempt from the need to exercise the same ordinary care that others do with respect to non-professional functions such as this, there should be no special duty arising from the fact that the source of this information is an attorney. For example, it is not uncommon for an attorney in a real estate transaction to ask a former attorney for a survey or title report to avoid the cost of securing new documents. Under the majority's opinion, if the attorney or any other member of the attorney's staff, due to careless law office management, sends an incomplete survey, the attorney may be liable to a third party for damages resulting from reliance on the mis-collated survey. Although attorneys may be liable to non-clients for their own professional work, they are not and should not be guarantors of the accuracy of surveys or other similar experts' reports that they merely transmit.

### III

Furthermore, for a non-client to recover for negligent misrepresentation, the non-client must establish that she or he relied on

the negligent conduct of the attorney to her or his detriment. Petrillo consistently testified that she never intended to rely on Heritage's two-page report, that she did not rely on the two-page report, that she included in the contract of sale a provision allowing her an additional forty-five days in which to get her own percolation tests, and that she hired an engineering firm to perform percolation tests for her. Even in the context of Petrillo's motion for summary judgment, there is no evidence that Petrillo relied on the truncated report.

Nor did Petrillo rely on Herrigel for legal representation. Petrillo testified that she did not intend at anytime to rely on Herrigel to provide legal representation to her, that she never hired Herrigel for any purpose, that Herrigel never directly gave her any information relating to the transaction, that she never requested her attorney to make any inquiry of Herrigel relating to the percolation tests, and that Herrigel had not failed or refused to answer any question relating to this matter that was put to him. She testified that Herrigel did not directly provide her with any information upon which she relied in deciding to terminate the contract. She testified that her decision to terminate the contract was based solely on information imparted to her by her experts and was not based in any way on information given to her by Herrigel:

Q: The decision to terminate, your decision to terminate the contract was solely based open [sic] information imparted to you by your experts, is that correct?

A: Yes.

Q: And it was not based in any way on information given to you by Mr. Herrigel?

A: Yes. Right.

## IV

Herrigel owed no duty of care to Petrillo. She did not rely on his legal opinion. He did not provide her with other legal services nor did he undertake to perform any specific tasks for her. The attenuated chain of events that led to Petrillo having the report makes her too remote from Herrigel for him to have foreseen

harm to her. Moreover, as the record demonstrates, Petrillo did not rely on the report. Accordingly, I respectfully dissent.

For affirmance—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN and STEIN—5.

Concurring—Justice STEIN—1.

For reversal—Justice GARIBALDI—1.