A05A1190. TALTON v. ARNALL GOLDEN GREGORY, LLP et al.
(622 SE2d 589)

ELLINGTON, Judge.

Timothy C. Talton appeals from the trial court's dismissal of his negligence action against William H. Kitchens and the law firm of Arnall Golden Gregory, LLP. Finding no error, we affirm.

"A motion to dismiss may be granted only when the complaint establishes that the plaintiff is not entitled to relief under any facts that could be proved. We review the trial court's ruling de novo." (Citations omitted.) *Cook v. Regional Communications*, 244 Ga. App. 869, 870 (539 SE2d 171) (2000). The complaint at issue shows the following: CryoLife, Inc. is a corporation which purchased human cadaver tissue from another company, then processed, packaged, and distributed the tissue to hospitals for use in implants and other surgeries. Prior to June 2001, CryoLife was aware that some of the cadaver tissue it had processed was contaminated with Clostridium bacteria. Even with this knowledge, CryoLife failed to properly test or treat the cadaver tissue before distributing the tissue to hospitals, and such failure violated industry standards.

Defendants Kitchens and his employer, Arnall Golden Gregory, LLP (collectively, "AGG"), were CryoLife's attorneys. Prior to June 2001, AGG consulted with CryoLife about the cadaver tissue and was aware of CryoLife's procedures for testing and treating the cadaver tissue. AGG recommended to CryoLife that the corporation attach

---

[17] (Emphasis supplied.)

warning labels to the cadaver tissue packages stating that the tissue was not sterile and advising physicians to prescribe prophylactic antibiotics. At some point after AGG made that recommendation, but before June 2001, CryoLife shipped the tissue to hospitals in packages that contained warning labels which stated the tissue had been tested for infectious disease. The labels also said the tissue had been

> treated with antimicrobials to reduce the number of organisms that may have been present at the time of procurement, and subsequently, a portion of this tissue was tested and found to be free from detectable levels of bacterial and fungal microorganisms. Although this tissue has been tested, there is no assurance that this tissue is free from all infectious diseases or microbial contamination.

Each package also contained a "Certificate of Assurance" which stated that "This allograft was aseptically processed by CryoLife's proprietary process. The finished product conforms to CryoLife's strict and exacting microbiology and quality standards." It is undisputed that neither the warning label nor the Certificate of Assurance referred in any way to Kitchens or AGG.

On June 27, 2001, Talton had outpatient knee surgery involving an allograft medial meniscus implant in his right knee. The physician performing the allograft used cadaver tissue that had been provided to the hospital by CryoLife. Prior to Talton's surgery, CryoLife had actual knowledge that the donor of the cadaver tissue used in the surgery was infected with Clostridium bacteria, but did not notify the hospital or Talton's physician. It is undisputed that Talton never saw the warning label on the tissue package prior to his surgery. Talton developed a severe post-operative infection in his knee which required additional surgeries and caused other serious injuries.

On July 25, 2003, Talton sued CryoLife and its corporate officers for strict liability, negligence, and professional negligence.[1] The complaint alleged that CryoLife failed to properly process the cadaver tissue and failed to adequately warn patients, physicians, and hospitals of the risks of implanting the tissue. In Count 3 of the complaint, Talton also sued CryoLife's lawyers, Kitchens and AGG, for common law negligence.[2] Talton alleged that AGG acted negligently when it recommended and prepared an inadequate warning label and that, when it did so, AGG knew that third parties, including hospitals, physicians, and patients, would rely on the warning label.

---

[1] Talton has since settled his lawsuit against CryoLife and its officers.

[2] The complaint does not contain allegations of professional negligence against either Kitchens or AGG.

AGG answered and filed a motion to dismiss Count 3 of the complaint pursuant to OCGA § 9-11-12 (b) (6). In its answer and at the motion hearing, AGG contended that it had no duty as a matter of law to warn nonclients, such as patients receiving the cadaver tissue during surgery, of risks associated with the tissue. It also noted that, when a medical device can only be prescribed or inserted by a physician, the physician is solely responsible for informing the patient of the risks of using the device. It is undisputed that CryoLife never distributed the cadaver tissue directly to patients and that hospitals or physicians removed the tissue from the packaging prior to or during surgery, and AGG contended that patients never had the opportunity to review or rely upon the warning label. In addition, AGG argued that it provided legal advice regarding the warning label to its client, CryoLife, and that such advice was confidential and intended only for CryoLife's consideration and use. According to AGG, because patients never actually saw the warning label, Talton could not show that AGG was actually aware that patients such as Talton would rely on AGG's confidential legal advice to CryoLife regarding the label. Further, AGG argued that it had no control as to whether CryoLife followed its advice, noting that CryoLife made the final decision on whether to accept AGG's legal advice and what information, if any, to include in the warning label. AGG asserted that CryoLife was therefore solely responsible for the adequacy of the warning labels. In response, Talton contended that, by advising CryoLife on the language for the warning labels, AGG had undertaken a duty to warn third parties of the risks and, therefore, was responsible for the harm resulting from the inadequate warning. The trial court granted AGG's motion to dismiss, and Talton appeals.

1. Talton contends the trial court erred in finding as a matter of law that AGG owed no duty to adequately warn him of the material risks of using the cadaver tissue. In order to maintain a cause of action for negligence, a plaintiff must be able to prove that the defendant owed a legally cognizable duty to the plaintiff to conform to a certain standard of conduct, the defendant breached this duty, and the breach damaged the plaintiff. *Martha H. West Trust v. Market Value of Atlanta*, 262 Ga. App. 90, 91 (1) (584 SE2d 688) (2003). In this case, it is undisputed that Talton was never a client of AGG and that there was no privity between the parties that might have created a duty owed by AGG to Talton. Therefore, Talton must show that AGG owed him a duty under some other legal theory. Id.

(a) Talton argues that AGG's duty to him arose under the Restatement of Torts 2d, § 552 (1977).[3] The Supreme Court of Georgia

---

[3] Restatement of Torts 2d, § 552 (1977), states as follows:

adopted Section 552 of the Restatement in *Robert & Co. Assoc. v. Rhodes-Haverty Partnership*, 250 Ga. 680, 681-682 (300 SE2d 503) (1983), a case in which the Court considered whether an engineer could be liable to a limited class of third parties when it was foreseeable that the third parties would rely on the engineer's report. The Court adopted the following rule:

> one who supplies information during the course of his business, profession, employment, or in any transaction in which he has a pecuniary interest has a duty of reasonable care and competence to parties who rely upon the information in circumstances in which the maker was *manifestly aware of the use to which the information was to be put and intended that it be so used. This liability is limited to a foreseeable person or limited class of persons for whom the information was intended, either directly or indirectly.* In making a determination of whether the reliance by the third party is justifiable, we will look to the purpose for which the report or representation was made. If it can be shown that the representation was made for the purpose of inducing third parties to rely and act upon the reliance, then liability to the third party can attach. If such cannot be shown there will be no liability in the absence of privity, wilfulness or physical harm or property damage.

(Emphasis supplied.) Id. The Court later clarified its ruling in *Badische Corp. v. Caylor*, 257 Ga. 131, 132-133 (356 SE2d 198) (1987), holding as follows:

---

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

We specifically reject the plaintiffs' argument that the rule established in *Robert & Co.*[, supra,] expands professional liability for negligence to an unlimited class of persons whose presence is merely "foreseeable." Rather, professional liability for negligence . . . extends to those persons, or the limited class of persons who the professional is *actually aware* will rely upon the information he prepared.

(Footnote omitted; emphasis supplied.) Id. at 133 (an accountant was not liable to a third party who relied upon financial statements he had prepared for a client because the accountant did not have actual notice that the client was going to give the statements to the third party). See also *Martha H. West Trust v. Market Value of Atlanta*, 262 Ga. App. at 93 (2) (a property appraiser was not liable to third parties who relied on his appraisal when the appraiser expressly prohibited his client from giving the appraisal to others and did not intend for the appraisal to be used by nonclients).[4]

In this case, the "information" which allegedly caused Talton's injuries is the content of the warning label. AGG was not identified in any way on the warning label. It is also undisputed that CryoLife, not AGG, distributed the tissue packages with the warning labels to hospitals and that CryoLife never distributed the packages or warning labels directly to patients.

In contrast, the only "information" that AGG provided in this case was its legal advice to CryoLife regarding the language of the warning label, and this advice was given within the confines of a confidential attorney/client relationship. As AGG's responsive pleadings made clear, this confidential advice was intended solely for the consideration and use by CryoLife. Further, AGG had no control over whether CryoLife followed its advice. Talton has failed to demonstrate that AGG ever intended for its advice to be disclosed to or relied upon by third parties. Accordingly, Talton is unable to show that, when AGG consulted with CryoLife, AGG was "actually aware" that patients such as Talton would rely upon such confidential legal advice. *Badische Corp. v. Caylor*, 257 Ga. at 133; *Martha H. West Trust v. Market Value of Atlanta*, 262 Ga. App. at 93 (2). Without such

---

[4] To the extent Talton relies on *Petrillo v. Bachenberg*, 139 N.J. 472, 485-488 (IV) (655 A2d 1354) (1995), such reliance is misplaced. In *Petrillo*, the Supreme Court of New Jersey held that an attorney who intentionally wrote a misleading report about real property for a broker could be liable to the purchaser under Section 552. Unlike Georgia's courts, however, New Jersey's interpretation of Section 552 extended liability to third parties who were merely "foreseeable."

awareness, AGG owed no duty to Talton under Section 552 of the Restatement of Torts 2d.

(b) Talton also argues that AGG owed a duty to him under Section 324A of the Restatement, which addresses the liability to third parties when one undertakes to perform another's duty.[5] The cases upon which Talton relies, however, involve the liability of manufacturers (and their corporate officers), distributors, or retailers to injured users of their products based upon their failure to warn the users.[6] These cases are clearly distinguishable from the instant case, because there is no allegation that AGG participated in the procurement, processing, or distribution of the infected tissue. See *Boyce v. Gregory Poole Equip. Co.*, 269 Ga. App. 891, 896 (1) (c) (2) (605 SE2d 384) (2004) (limiting the duty to warn under Section 324A in product liability cases to distributors and sellers of dangerous products who are aware that the manufacturer's warnings are inadequate or misleading). Talton has failed to cite to any authority which applies Section 324A to establish a cause of action by a third party against an attorney based upon the attorney's confidential advice to a client. Therefore, we find that this argument lacks merit.

(c) Talton contends that, even if there is no legal basis to find that AGG owed him a duty, we should find such duty based upon public policy. Essentially, he argues that public policy demands that an attorney be held accountable when the attorney gives confidential advice to a client and the client later acts in a manner that harms a third party, regardless of whether the client's actions were consistent with the attorney's advice. This is not, nor has it ever been, the law of Georgia, and we decline Talton's invitation to adopt such a rule. To do otherwise would be to expose attorneys to potentially unlimited liability to third parties who were never their clients and who had no

---

[5] According to the Restatement of Torts 2d, § 324A,

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

(Citation and punctuation omitted.) *Beam v. Omark Indus.*, 143 Ga. App. 142, 145 (1) (b) (237 SE2d 607) (1977).

[6] See *Boyce v. Gregory Poole Equip. Co.*, 269 Ga. App. 891, 896 (1) (c) (2) (605 SE2d 384) (2004) (distributor of product); *Swanson v. McNeil, PPC, Inc.*, 1996 U. S. Dist. LEXIS 4826 at *11 (I) (B) (E.D. Pa. 1996) (corporate officer in charge of medical affairs for manufacturing company); *In re Silicone Gel Breast Implants Products Liability Litigation*, 887 FSupp. 1455, 1460 (IV) (A) (1) (N.D. Ala. 1995) (corporation which researched, manufactured, and distributed product); *Beam v. Omark Indus.*, 143 Ga. App. at 145 (1) (b) (distributor of product).

basis upon which to reasonably rely on the attorneys' confidential advice to their clients. See *Badische Corp. v. Caylor*, 257 Ga. at 133 (finding that a professional who provides information to clients is not liable to third parties whose reliance on the information is merely "foreseeable").

(d) Because Talton has failed to demonstrate that AGG had a duty to warn him of the risks associated with the CryoLife cadaver tissue, Talton's negligence claim must fail as a matter of law. *Martha H. West Trust v. Market Value of Atlanta*, 262 Ga. App. at 93 (2). The trial court did not err dismissing Talton's suit against AGG.

2. Talton contends that the trial court erred in dismissing his complaint based upon the "learned intermediary" doctrine.[7] Pursuant to our decision in Division 1, supra, this issue is moot.

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

DECIDED SEPTEMBER 29, 2005 —
RECONSIDERATION DENIED OCTOBER 20, 2005 — 

*Don C. Keenan, Allan L. Galbraith*, for appellant.

*Hawkins & Parnell, William H. Major III, David H. Wilson, Bondurant, Mixson & Elmore, Steven J. Rosenwasser, Jeffrey O. Bramlett*, for appellees.

---

[7] Under the learned intermediary doctrine, the manufacturer of a prescription drug or medical device does not have a duty to warn the patient of the dangers involved with the product, but instead has a duty to warn the patient's doctor, who acts as a learned intermediary between the patient and the manufacturer. The rationale for the doctrine is that the treating physician is in a better position to warn the patient than the manufacturer, in that the decision to employ prescription medication or medical devices involves professional assessment of medical risks in light of the physician's knowledge of a patient's particular need and susceptibilities. Finally, . . . under the learned intermediary doctrine, the manufacturer's warnings to the physician must be adequate or reasonable under the circumstances of the case.
(Punctuation and footnotes omitted.) *McCombs v. Synthes (U.S.A.)*, 277 Ga. 252, 253 (1) (587 SE2d 594) (2003).