**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3941-17T2

JAYMIE M. CORNINE,

     Plaintiff-Appellant,

v.

JONATHAN S. PUCCIA and
BORGATA HOTEL CASINO
& SPA,

     Defendants-Respondents.

_____

Argued January 30, 2019 – Decided January 14, 2020

Before Judges Alvarez and Nugent.

On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Docket No. L-0342-15.

Richard Arthur Dunne argued the cause for appellant.

Justin A. Britton argued the cause for respondent Borgata Hotel Casino & Spa (Cooper Levenson, PA, attorneys; Russell L. Lichtenstein, Justin A. Britton and Jennifer Broeck Barr, on the brief).

The opinion of the court was delivered by

NUGENT, J.A.D.

This personal injury action stems from defendant Jonathan S. Puccia's assault of plaintiff, Jaymie M. Cornine, in the Borgata Hotel Casino & Spa in Atlantic City. Plaintiff appeals from the summary judgment dismissal of his complaint against Borgata. The trial court granted summary judgment to Borgata because plaintiff had not served an expert report addressing Borgata's security. Because plaintiff did not allege Borgata's security, in general, was inadequate, and because the summary judgment record demonstrates a jury question as to whether Borgata employees negligently failed to take minimal action to prevent the assault—a matter not beyond the ken of a lay person—we reverse and remand for trial.

The personal injury complaint plaintiff filed in May 2015 alleged four causes of action. The first count, which contained allegations only against Borgata, alleged Borgata breached its duty "to properly supervise the premises and use reasonable care to make those premises safe for their invitees like [plaintiff]." Borgata breached this duty, according to the complaint, through its employees, who "carelessly, recklessly and negligently allowed various circumstances to evolve and develop, about which the defendants were aware as those circumstances were evolving and developing, to the point of creating a

dangerous condition on and/or inside the premises they managed, supervised and/or controlled . . . ." The allegation added that the dangerous condition "could have readily been eliminated and/or prevented had . . . defendants taken reasonable steps to eliminate and/or prevent them, which they didn't, lead[ing] directly to a vicious assault and battery of [plaintiff]." The first count also alleged plaintiff sustained injuries proximately caused by Borgata's negligence.

The complaint's second count, which included allegations against both Puccia and Borgata, alleged Borgata negligently failed to take any action to prevent the assault or stop the assault during its commission. The third count alleged Borgata's employees had knowledge of Puccia's violent propensities and heard him threaten to harm plaintiff sufficiently in advance of the assault to take action to prevent it, but did nothing, thus breaching the duty they owed plaintiff, a business invitee. The fourth count alleged defendants' conduct rose to a level of culpability warranting punitive damages.

Defendant Puccia defaulted. Following completion of discovery, Borgata moved for summary judgment. The trial court granted the motion. The court apparently perceived plaintiff's action as one involving professional negligence and the assessment of proper security protocols, which required expert testimony. The court concluded that absent expert testimony addressing this

issue, "the jury cannot determine what response would have been appropriate at the time of the incident."

The court denied plaintiff's motion for reconsideration. Thereafter, the court entered a default judgment in the amount of $160,000 plus pre-judgment interest against Puccia. This appeal followed.

The motion record, construed in the light most favorable to plaintiff as the non-moving party, Petro-Lubricant Testing Labs., Inc. v. Adelman, 233 N.J. 236, 256 (2018), discloses the following facts. Puccia assaulted plaintiff on January 1, 2014, at Borgata, shortly after five o'clock in the morning, after the two exchanged words while playing craps—a dice game. Plaintiff was playing craps with a friend for approximately thirty to forty-five minutes before Puccia assaulted him. An unknown gentleman was beside plaintiff and his friend, to their right. Puccia's girlfriend was to the right of the unknown gentleman, and Puccia was to the right of his girlfriend. Plaintiff and his friend were talking with Puccia and his girlfriend about Puccia's hometown, mutual friends, and boating. Plaintiff gave this account of the assault in his interrogatory answers:

> I remember that I was speaking with another gentleman who was next to me at the table when defendant, Puccia, and his girlfriend joined the conversation. At first, the conversation was pleasant but suddenly, and without warning, and for no reason that was apparent to me, defendant, Puccia, became irate and told me to

4

"shut the fuck up." I was totally baffled as to why he would say that to me, as the conversation leading up to this statement seemed friendly and pleasant. Not knowing what prompted the defendant to react in that manner I told him to calm down. His girlfriend also tried to calm him down, but when she did he struck her hard in the face with the back of his hand.

When Puccia hit his girlfriend I told him not to strike a woman. Soon after I told him not to strike a woman Puccia became even more aggressive, picking up and throwing a glass with ice at me that was located to his right on the ledge of the "craps" table and then attempting to leap across the table and strike me with his closed fist. When he failed to connect with his punch after leaping across the table he then ran around to my side of the table and continued trying to punch me. After avoiding another punch he threw I was somehow able to wrap him up in a bear hug, but in doing so he pushed and then tackled me to the ground. That is when I began to experience excruciating pain in my left knee. I remember screaming for help while trying to control the defendant, but it seemed like an eternity before security personnel from the casino finally came and pulled Puccia off me. As far as I could tell nobody employed by the casino made any attempt to intercede and stop Puccia from behaving the way he did, not even when he hit his girlfriend.

In fact, when several videos of the event(s) are reviewed that were created by cameras located inside the casino, it can clearly be seen that no attempts were made by either casino security or pit bosses in the area to remove and/or escort Puccia from the table between the time he struck his girlfriend in the face and the moment the videos show him picking up a glass with ice and throwing it at me even though one of the pit bosses is seen approaching him after seeing him strike

5

his girlfriend.[1]  According to the timers on the various videos at least sixteen (16) seconds elapsed between those two very aggressive and inappropriate acts he committed, which was more than enough time for personnel from the casino to take steps to have him removed from the area on account of his inappropriate behavior.  Had the appropriate action been taken by personnel from the Borgata, with Puccia being escorted away from the table after striking his girlfriend, he would have never had the opportunity to charge me and injure my knee.  Even after he threw the glass at me the videos show nearly ten (10) more seconds elapsed before he charged towards me and injured my knee. Those same videos show a [Floorperson] standing right beside Puccia for the entire ten (10) second span doing nothing to [defuse] Puccia's obvious explosive and physically inappropriate behavior.

During his deposition, plaintiff explained he spoke to Puccia and Puccia's girlfriend for approximately five to ten minutes before Puccia told him he should shut up.  After Puccia told plaintiff to shut up and used the expletive, Puccia's girlfriend tried to calm him down, but he became irate and struck her.  Puccia's anger intensified after plaintiff said he should not hit a woman.

Plaintiff said it appeared Puccia knew the Floorperson from the way they were conversing.  Puccia had also been conversing with the dealer.  After

---

[1]  Throughout the motion transcript, witnesses refer to this and other similarly-employed Borgata employees as "pit boss," "table games supervisor," "floor supervisor," and "Floorperson."  For the remainder of this opinion, we will refer to such employees as "Floorperson."

A-3941-17T2

"backhanding" his girlfriend, Puccia "proceeded to throw his cup of ice and beverage on [plaintiff]." Plaintiff described the drink as a "full cup of ice with a little bit of liquid. An alcoholic beverage was in the cup." Puccia then tried to jump across the table and punch plaintiff.

Plaintiff estimated approximately thirty seconds elapsed between Puccia backhanding his girlfriend and attacking him. Plaintiff estimated ten seconds elapsed between Puccia jumping across the table to strike him and the physical altercation during which Puccia took plaintiff to the ground. According to Borgata's incident report, Puccia was detained and eventually evicted, permanently, from Borgata.

The video surveillance corroborates plaintiff's testimony. Significantly, after Puccia made threatening gestures and threw his ice and what remained of his drink at plaintiff, he attempted to grab some gambling chips to throw at plaintiff. A Borgata Floorperson (the first Floorperson) intervened by grabbing Puccia's arm. While in the presence of the first Floorperson, Puccia desisted from his threatening and assaultive conduct. Yet, the first Floorperson appears to have taken no further action to defuse the situation or prevent Puccia from attacking plaintiff. Within seconds thereafter, Puccia ran around to plaintiff and

7

assaulted him. Approximately five to seven seconds after Puccia took plaintiff to the ground, Borgata security officers pulled Puccia off.

Plaintiff's friend corroborated plaintiff's testimony. The friend testified that after plaintiff had been conversing with Puccia and Puccia's girlfriend for a while, Puccia became silent and appeared to be getting angry. The friend deduced Puccia's anger from his clenched fists and facial expressions. According to the friend, plaintiff continued to talk with Puccia's girlfriend. Asked by defense counsel at his deposition if he had any idea why Puccia was becoming angry, the friend responded, "[f]rom my knowledge, I mean, just from what I think, I think it's because Mr. Puccia's girlfriend was talking to [plaintiff]." Asked by defense counsel what prompted Puccia to tell plaintiff to shut the f*** up, the friend replied, "I don't really think it was anything. I think he just wanted [plaintiff] and his girlfriend, Mr. Puccia's girlfriend, to stop talking."

Plaintiff's friend testified that after Puccia struck his girlfriend the dealer reached over to try to stop Puccia from continuing. Then, according to the friend, the first Floorperson came over and asked if everything was "all right." After describing the intervening events, plaintiff's friend testified Puccia "tried

walking around the table and I think the [first Floorperson] stopped him[.]" The friend then described Puccia's assault on plaintiff.

The first Floorperson claimed to have no memory of the assault or the events leading up to it. When deposed and questioned about the surveillance video, the first Floorperson identified himself, a second Floorperson, and the dealer. The first Floorperson also described his actions as depicted in the surveillance video. He acknowledged he was the person who grabbed Puccia's arm after Puccia "pick[ed] up a drink and toss[ed] it to the gentleman on the far side." He grabbed Puccia's arm because it appeared Puccia "was trying to pick up some chips from the table game and . . . toss them to the gentleman on the far side."

Continuing to view the surveillance video, the first Floorperson described himself "backing away" after Puccia threw his drink and tried to throw chips at plaintiff. He surmised he was backing away because he believed that everything was under control.

Plaintiff deposed the second Floorperson, who also claimed to have no memory of the assault or the events leading up to it. Viewing the video did not refresh his recollection. He was, however, able to identify the first Floorperson, the craps dealer, and himself in the video. Unlike the first Floorperson, however,

the second Floorperson acknowledged that Puccia's throwing the contents of the glass at plaintiff would warrant calling security; it would compel him to contact security.

The second Floorperson explained there were two ways to notify security: pushing a button mounted on the side of a "pit stand" depicted in the surveillance video or using a phone. He identified a third Floorperson seen in the video as the one who pushed the panic button when Puccia assaulted plaintiff.

Borgata retained "a self-employed security and risk management consultant." According to his report, his "responsibilities while employed by various employers included performing security functions, training and managing proprietary security forces, overseeing contracted security services, and off-duty special employment law enforcement officers." According to the expert's report, during his career, the expert had "developed an in depth understanding of security applications, target hardening applications, asset protection techniques, and security force administration through practical experience, education, trade associations, public sector interaction, and professional certification."

After providing an overview of the incident, enumerating nine of his observations from the surveillance video, summarizing certain deposition

10

testimony, and citing certain documents, the expert provided thirteen paragraphs of "Professional Opinions." For example, the expert noted "plaintiff knew of Puccia's girlfriend from mutual acquaintances," and "Puccia, his girlfriend and others were conversing while gaming at the craps table prior to the altercation." He added, "[t]he conversation between the parties quickly escalated from friendly to hostile in nature." Most of the remaining "professional observations" are readily apparent to anyone viewing the surveillance video. The expert offered four conclusions:

> 10.    Borgata casino games management response to the verbal banter and then to the physical altercation was reasonable and proper.
>
> 11.    In compliance with regulatory requirements imposed by the New Jersey Casino Control Act and the New Jersey Division of Gaming Enforcement, the Borgata table games pit where the incident took place possessed telephones and two duress/trouble alarms that were configured to silently alert the Security Department, the Surveillance Department, and the in-house office of the Division of Gaming Enforcement (DGE) simultaneously.
>
> 12.    In accordance with the policy of Borgata, the duress alarm in the pit was activated by casino games supervisor Raphael Villa when the disturbance at the craps table turned physical.
>
> 13.    When notified, Borgata security properly reacted . . . by responding to the pit and separating the involved parties, detaining Puccia, offering medical assistance to

11

the plaintiff, and offering to contact the DGE on behalf of the plaintiff.

The gist of the expert's opinion is concisely summarized in a sentence taken from the "conclusion" section of his report: "The evidence revealed that the plaintiff's assault at the hands of Puccia was sudden and not telegraphed by any discernible pre-incident indicators." The expert added:

> This event is categorized as an act of <u>sudden</u> <u>violence</u> in that there were no discernible pre-incident indicators that placed Borgata on-notice [sic] that co-defendant Joseph Puccia was going to strike the plaintiff. No threat of bodily harm was communicated by Puccia to the plaintiff during the brief verbal interaction that took place just prior to the sudden aggressive actions taken by Puccia against the plaintiff. Thus, this event could not have been prevented by Borgata despite its employment of reasonable and customary security industry measures.

The expert does not cite any specific "security industry measures" concerning these observations.

As previously noted, the court granted summary judgment to Borgata, and this appeal followed.

Appellate courts "review[] an order granting summary judgment in accordance with the same standard as the motion judge." <u>Bhagat v. Bhagat</u>, 217 N.J. 22, 38 (2014). Our function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for

12

trial." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)); accord, R. 4:46-2(c). A trial court's determination that a party is entitled to summary judgment as a matter of law is not entitled to any "special deference," and is subject to de novo review. Cypress Point Condo. Ass'n v. Adria Towers, L.L.C., 226 N.J. 403, 415 (2016).

The trial court granted summary judgment to Borgata on the ground that plaintiff was required to produce expert testimony to prove Borgata's negligence. To present a prima facie claim of negligence against Borgata, plaintiff was required to prove "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." Townsend v. Pierre, 221 N.J. 36, 51 (2015) (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 584 (2008)). "The determination of the existence of a duty is a question of law for the court." Petrillo v. Bachenberg, 139 N.J. 472, 479 (1995) (citing Wang v. Allstate Ins. Co., 125 N.J. 2, 15 (1991)).

Here, Borgata does not dispute that plaintiff was a business invitee. As such, Borgata owed plaintiff a duty "to provide a reasonably safe place to do that which is within the scope of the invitation." Butler v. Acme Mkts., Inc., 89 N.J. 270, 275 (1982). This included "a duty to protect patrons

. . . from foreseeable criminal acts of third parties occurring on their premises." Clohesy v. Food Circus Supermarkets, 149 N.J. 496, 504 (1997) (citing Butler, 89 N.J. at 280). Borgata argues plaintiff needed an expert to establish a breach of its duty and that Puccia's assault of plaintiff was foreseeable. We disagree.

"There is no general rule or policy requiring expert testimony as to the standard of care . . . ." Scully v. Fitzgerald, 179 N.J. 114, 127 (2004) (quoting Butler, 89 N.J. at 283). Nor is expert testimony always required to assess whether a particular defendant acted negligently. Jacobs v. Jersey Cent. Power & Light Co., 452 N.J. Super. 494, 505 (App. Div. 2017). "Indeed, expert testimony is not necessary when the jury can understand the concepts in a case 'utilizing common judgment and experience.'" Ibid. (quoting Campbell v. Hastings, 348 N.J. Super. 264, 270 (App. Div. 2002)). Thus, "expert testimony 'should not be permitted unless it concerns a subject matter that is "so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman."'" Ibid. (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 702 (2017)).

Here, expert testimony is unnecessary and should not be permitted. A jury is quite capable of understanding the concepts of duty, breach, and proximate cause.

We first note that Borgata, not plaintiff, characterized the theory of liability as one of "negligent security." The jury, however, will not have to determine "proper security and crowd control procedures necessary to safely operate a casino" as Borgata suggests. The jury will not, for example, be required to determine whether Borgata had an adequate number of security personnel on its premises or whether security personnel were adequately positioned throughout the casino. Nor is such testimony is required—as Borgata argues—"because the casino industry is so highly regulated and the security procedures that go into safe operation of a casino are esoteric in nature." That is not the issue.

Borgata's duty is defined by the general duty owed by the owner of a business to its invitees. Moreover, the jury is quite capable of utilizing common judgment and experience to determine whether Borgata breached its duty. The jury will be presented with a video of the occurrence, supplemented by the testimony of plaintiff and his friend. From that evidence, the jury can infer Puccia had something alcoholic to drink and shortly after 5:00 in the morning on New Year's Day engaged in an episode of irrational behavior and aggression directed at plaintiff, apparently for no other reason than plaintiff was talking to his girlfriend. During this irrational episode, Puccia told plaintiff to shut the

15

f*** up, threw ice and what was left of an alcoholic beverage at plaintiff, attempted to throw chips at him, and attempted to leap across the craps table to punch plaintiff. Puccia was deterred only by the presence of an authority figure, namely, the first Floorperson. The jury can infer the dealer witnessed all of these events unfold. The jury can also infer the first Floorperson observed some if not most of them. Under those circumstances, the jury can reasonably infer it was foreseeable Puccia would harm plaintiff if the casino personnel who had witnessed these events took no further action.

The first Floorperson did not ask Puccia to leave the craps table or leave the casino. He made no attempt to call security, notwithstanding—according to the second Floorperson—that Puccia's throwing a drink at plaintiff compelled contacting security. And the first Floorperson did not remain with Puccia and ask the second or third Floorperson to call security.

The jury does not need an expert to assess this episode of irrational human behavior and determine whether it was foreseeable Puccia would harm plaintiff—absent some action from the employees who were present other than simply walking away. Just as "[a] jury does not need a fire expert to explain . . . the dangers that might follow when a lit cigarette is thrown into a pile of

16

papers or other flammable material," <u>Scully</u>, 179 N.J. at 127, a jury does not need an expert here.

Although Borgata's expert cites four generic references to industry standards, he has cited no standard that addresses the precise situation that unfolded in this case. For example, the expert asserts, "plaintiff's assault at the hands of Puccia was sudden and not telegraphed by any discernible pre-incident indicators." He adds, "[n]o threat of bodily harm was communicated by Puccia to the plaintiff during the brief verbal interaction that took place just prior to the sudden aggressive actions taken by Puccia against the plaintiff."

We disagree that absent Puccia verbalizing his intent to harm plaintiff, a jury could not conclude it was foreseeable that he would do so. After all, Puccia's aggressive behavior toward plaintiff escalated from a verbal epithet to throwing objects and then to leaping across the craps table in an effort to punch plaintiff. As we have indicated, the only thing that momentarily deterred Puccia was the interaction and presence of the first Floorperson. Given those circumstances, we conclude a jury could determine the foreseeability of Puccia harming plaintiff even in the absence of Puccia announcing an intent to do so.

The expert also characterizes Puccia's attack as "stealthy" in nature. The jury can readily determine from the video surveillance and testimony whether

17

the attack was "stealthy," as the expert asserts, or whether the entire record demonstrates that Puccia's attack was anything but stealthy.

Indisputably, as Borgata asserts, the casino industry is highly regulated. However, Borgata has not cited any industry standard that addresses the specific issues of duty and proximate cause presented here. Borgata has failed to demonstrate that these issues "are so esoteric or technical to be beyond jurors' common notions of reasonableness." Jacobs, 452 N.J. Super. at 507-08. Although the provision and operation of a security force are matters beyond the ken of a lay person, that is not what must be decided here. The situation that arose at 5:00 in the morning on New Year's Day could have occurred in a bar or any number of other establishments providing entertainment or alcohol, regardless of whether industry regulations require such an establishment to maintain a security force.

Our opinion should not be construed as suggesting how a jury should decide this matter. We have merely determined that a jury is quite capable of deciding the issues of duty and proximate cause, under the court's instructions, without the necessity of expert testimony. These issues should be submitted to a jury for determination. See Winstock v. Galasso, 430 N.J. Super. 391, 418 (App. Div. 2013) ("Ordinarily, proximate cause is a jury question."). Nor do we

A-3941-17T2

address the claim for punitive damages, as that issue has not been presented on appeal.

Reversed and remanded for trial.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3941-17T2